ULLIMAN, Appellee,

v.

OHIO HIGH SCHOOL ATHLETIC ASSOCIATION, Appellant.

[Cite as *Ulliman v. Ohio High School Athletic Assn.*,
184 Ohio App.3d 52, 2009-Ohio-3756.]

Court of Appeals of Ohio,
Second District, Clark County.

No. 08–CA–99.

Decided July 31, 2009.

Paul J. Kavanagh, for appellee.

Steven L. Craig, for appellant.

FAIN, Judge.

{¶ 1} Defendant-appellant Ohio High School Athletic Association ("OHSAA") appeals from a preliminary injunction issued in favor of plaintiff-appellee Benjamin Ulliman. The injunction restrained OHSAA from prohibiting Ulliman's participation in interscholastic athletics during his senior year at Catholic Central High School and from taking adverse action against Ulliman or Catholic Central for allowing Ulliman to participate.

{¶ 2} OHSAA contends that the trial court exceeded its authority by interfering with the management of OHSAA and its member schools, because Ulliman failed to assert a constitutionally protected property right, and because there was no showing that OHSAA acted in excess of its powers, or that collusion or fraud

existed. OHSAA further contends that the trial court's decision is against the manifest weight of the evidence, is an abuse of discretion, and is contrary to law.

{¶ 3} We conclude that the trial court erred in enjoining OHSAA from enforcing the transfer bylaw against Ulliman and Catholic Central. The trial court incorrectly concluded that the transfer rule did not apply to Ulliman. The court's interpretation was unreasonable, because it was not supported by the language in OHSAA bylaws, or by the evidence presented. Ulliman also failed to establish that OHSAA acted arbitrarily in applying the transfer rule. Accordingly, Ulliman failed to prove that he had a substantial likelihood of success on the merits and that an injunction was warranted.

{¶ 4} The preliminary injunction is therefore reversed and vacated.

## I

{¶ 5} Benjamin Ulliman filed this action in October 2008. At the time, Ulliman was living with his grandparents in Springfield, Ohio, and was enrolled as a senior at Catholic Central High School ("Central"). Ulliman had previously enrolled in Alter High School in Kettering, Ohio, as a freshman, and had played football for Alter. During the first semester of tenth grade, Ulliman transferred to Centerville High School, which was the district where his parents resided. He did not play sports at Centerville, due to grade ineligibility. After finishing his sophomore and junior years of high school at Centerville, Ulliman moved to his grandparents' home in Springfield, and began participating in football practice with the Central team. He did not, however, play football for most of the fall season, because he was academically ineligible until the week of October 12, 2008.

{¶ 6} On October 13, 2008, OHSAA issued a letter ruling to Central. The letter indicated that Ulliman was ineligible to play for Central under OHSAA Bylaw 4–7–2, which governs student transfers. OHSAA noted that Ulliman would be ineligible to play interscholastic athletics at Central for one year from the date of his transfer. The letter cited possible exceptions to the policy—a change of custody to another individual living in a new school district (Exception 2), or a bona fide move by one of Ulliman's parents into a new school district (Exception 3).

{¶ 7} Two days after this ruling, Ulliman filed a complaint against OHSAA in Clark County Common Pleas Court. Ulliman alleged in the complaint that he was unable to satisfy the custody exception because he had turned 18 years of age in July 2008, and a domestic relations court's jurisdiction over child custody terminates when a minor reaches 18 years of age. Ulliman also alleged that he had met the requirements of the transfer rule, because he had not participated in

interscholastic athletics for more than a year after transferring from Alter to Centerville High School.

{¶ 8} On the same day the complaint was filed, Ulliman also filed motions for a temporary restraining order and for a preliminary injunction. The trial court held a hearing the next day and converted the procedure into a preliminary injunction hearing. The court reasoned that temporary restraining orders are generally granted ex parte, but in this case OHSAA had received notice and was present at the hearing. During the hearing, the trial court heard testimony from Deborah Moore, an OHSAA Associate Commissioner, and Matthew Ulliman, who is Benjamin Ulliman's father.

{¶ 9} According to the testimony and exhibits, OHSAA is a not-for-profit, private, and voluntary association of member schools, formed to promote the administration of interscholastic athletics in the state of Ohio. OHSAA has about 832 high school members and 865 junior high school members, and approximately 350,000 student athletes participate in interscholastic athletics per year.

{¶ 10} OHSAA has both a constitution and bylaws, and their language must be approved by a majority vote of the member high school principals. OHSAA's Board of Directors and commissioners cannot change the wording, unless a change in the Ohio Revised Code applies to a bylaw. In that event, the board can amend the bylaw to conform with Ohio law.

{¶ 11} The primary purpose of the eligibility bylaws is to provide for fair and equitable governing of student eligibility for students who participate in athletics in Ohio. Moore indicated that her major responsibilities are to interpret the bylaws, provide educational support for OHSAA members, and make rulings on eligibility. In rejecting Ulliman's request for eligibility, Moore relied on Bylaw 4-7-2, and the fact that none of the 11 exceptions to the bylaw fit Ulliman's situation.

{¶ 12} OHSAA's Bylaws state as follows:

{¶ 13} "4-7-1—The transfer bylaws apply to all students enrolled in grades 9-12. These bylaws apply to all schools, both public and non-public.

{¶ 14} "4-7-2—If a student transfers after the first day of the student's ninth grade year or after having established eligibility prior to the start of school by playing in a contest (scrimmage, preview or regular season/tournament contest), the student will be ineligible for one year from the date of enrollment in the school to which the student transferred. A student is considered to have transferred whenever the student changes from that school in which the student was enrolled as a ninth grader to any other school regardless of whether the school from which the student transferred or to which the student transfers is a

public or non-public, member or non-member or whether the high schools are within the same district."

{¶ 15} Moore interpreted these bylaws to mean that once Ulliman began at Alter as a freshman, he would be ineligible for one year from the date of enrollment in any school to which he subsequently transferred, regardless of the number of years that had elapsed between transfers, and regardless of the fact that the transfer at issue was not from Alter to the school in question. Thus, Ulliman would ordinarily have been ineligible for one year after he transferred from Alter to Centerville, and would also have been ineligible for one year after he transferred from Centerville to Central, even if he had previously sat out for a year at Centerville.[1]

{¶ 16} Moore testified that Ulliman could, in theory, have been eligible to play for Central under the following two exceptions to Bylaw 4-2-7:

{¶ 17} "EXCEPTION 2—if the student is the ward of a court-appointed guardian, and there is a subsequent change in that guardian, the student shall be eligible in the district of residence of the new guardian or at any non-public school provided the student lives with the guardian. Likewise, if the student is a child of parents who are either divorced or have had their marriage dissolved or annulled and there is a court-ordered change of custody, the student shall be eligible in the district of residence of the new custodial parent or at any non-public school provided the student lives with the new custodial parent. For purposes of this exception, the term 'parent' means the biological or adoptive parents of the student or, as the case may be, the person to whom parenting rights and responsibilities have been allocated pursuant to court order. In the event a student has been temporarily or permanently removed from the home, 'parent' means the person or governmental agency with legal or permanent custody.

{¶ 18} "* * * *

{¶ 19} "EXCEPTION 3—If, and only if, either one of the parents in a Shared Parenting Plan, notwithstanding any provisions therein to the contrary, makes a physical change that results in the student's transfer, the student shall be immediately eligible insofar as transfer is concerned."

{¶ 20} According to Moore, Ulliman could be eligible under these sections if custody had been transferred to Ulliman's grandparents, or if one of Ulliman's parents (who were divorced) had physically moved to Springfield. No court had

---

1.  Moore did testify that Ulliman would probably have been eligible to play sports at Centerville, because Centerville was apparently the residence of his parents. See Exception 6 to Bylaw 4-7-2. But Ulliman was, despite this interpretation, ineligible while at Centerville due to his grades.

jurisdiction to change custody, however, because Ulliman became 18 years old in July 2008. Furthermore, although Ulliman's parents had entered into a shared-parenting agreement in December 2007, neither parent was able to relocate to Springfield. Thus, under Moore's interpretation of Bylaw 4–7–2, Ulliman was ineligible to play interscholastic athletics at Central for a year following his enrollment there.

{¶ 21} Matthew Ulliman testified that his son was highly motivated to partici-pate in sports, and that sports were very important to his son's overall well-being and attitude. In the past, Benjamin Ulliman's grades had suffered tremendously when he could not participate in sports.

{¶ 22} The day after the hearing, the trial court issued an entry enjoining OHSAA from prohibiting Ulliman from participation in interscholastic athletics during his senior year at Central. The court also enjoined OHSAA from taking adverse action against Ulliman or against Central for allowing Ulliman to participate in athletics.

{¶ 23} On the merits, the trial court concluded that Bylaw 4–7–2 does not apply to Ulliman's transfer. The court stated that the first sentence of 4–7–2 covers all high school transfers from one school to another. However, the second sentence codifies a much narrower definition of the word "transfer," and does not cover transfers that occur after an initial transfer from the school attended during the student's freshman year. Accordingly, when Ulliman moved from Centerville to Central just prior to his senior year, he did not engage in a transfer pursuant to this narrow definition of 4–7–2. The trial court also concluded that OHSAA had acted arbitrarily, because Exception 2 could easily have applied, but for the fact that Ulliman had turned 18 years old in July 2008.

{¶ 24} OHSAA appeals from the preliminary injunction issued against it.

## II

{¶ 25} OHSAA's first assignment of error is as follows:

{¶ 26} "The trial court erred in exceeding its authority when it interfered with the management of the Ohio High School Athletic Association and its member schools by enjoining the OHSAA from prohibiting the plaintiff from participating in interscholastic athletics during plaintiff's senior year at Central when there has been no claim to a constitutionally protected property right or a showing that the officers acted in excess of their powers, or that collusion or fraud is claimed to exist on the part of the officers or a majority of the members."

{¶ 27} Under this assignment of error, OHSAA contends that the trial court erred because Ulliman did not allege that he had been deprived of a constitution-ally protected property right. OHSAA further contends that Ulliman failed to

show that OHSAA acted in excess of its powers, or that collusion, fraud, or arbitrariness existed.

{¶ 28} As a preliminary matter, we note that Ulliman has not filed a brief. Instead, Ulliman filed a notice indicating that he would not be filing a responsive brief, because he had received surgery for a "season-ending injury" and was no longer playing high school sports. This raises the issue of whether this appeal is moot.

{¶ 29} In *Dankoff v. Ohio High School Athletic Assn.*, Summit App. No. 24076, 2008-Ohio-4559, 2008 WL 4150285, the Ninth District Court of Appeals dismissed OHSAA's appeal of an order enjoining OHSAA from prohibiting a student from participating in athletics during his senior year. The Ninth District held that the appeal was moot, since the student had graduated, and there was no longer a live controversy regarding his participation in high school athletics. Id. at ¶ 4, relying on *Sandison v. Michigan High School Athletic Assn.* (C.A.6, 1995), 64 F.3d 1026.

{¶ 30} In *Sandison*, the Sixth Circuit Court of Appeals held that issues pertaining to the student plaintiffs were moot and did not fit within the "capable of repetition yet evading review" exception to mootness. The Sixth Circuit's holding was based on the fact that track season had ended, and the students' graduation from high school had eliminated any reasonable possibility that they would be subject to the same action again. 64 F.3d at 1030. This is the reasoning that was applied in *Dankoff*.

{¶ 31} The Sixth Circuit also concluded, however, that the case was not moot with regard to the second branch of the preliminary injunction, which prohibited the Michigan High School Athletic Association from penalizing the high school for allowing the students to compete. Id. Based on provisions in the association bylaws that allow victories to be forfeited and individual performances to be erased, the Sixth Circuit concluded that the students still had an interest in preventing the association from erasing from the records both their team victories and their individual performances. Id.

{¶ 32} In *Dankoff*, the Ninth District distinguished *Sandison*, because the trial court's injunction had only restrained OHSAA from preventing a student from bowling on the high school team. 2008-Ohio-4559, 2008 WL 4150285, at ¶ 4, and fn. 1. Although OHSAA argued that penalties could be imposed on the school as well, the Ninth District noted that OHSAA's bylaws in their entirety were not in the record. Id. The Ninth District, therefore, dismissed the case as moot.

{¶ 33} The injunction in the present case is like the one granted in *Sandison*, because the trial court enjoined OHSAA from taking action against either Ulliman or Central. OHSAA also submitted a complete copy of its bylaws, which

provide for forfeitures of all athletic contests where ineligible players have been used. Other sanctions are also available, including forfeiture of championship status, fines, and return of financial receipts. See Bylaws 11–2–1 and 11–2–3, and Bylaws 12–1–1 through 12–1–4. Accordingly, this matter is not moot, and we will consider OHSAA's argument that the trial court erred in issuing the injunction.

{¶ 34} The standard for reviewing preliminary injunctions is that an order granting or denying an injunction may not be reversed "absent a showing of a clear abuse of discretion." *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 35} Trial courts must consider the following factors in deciding whether to grant preliminary injunctions:

{¶ 36} " '(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review. (2) Has the petitioner shown that without such relief, it will be irreparably injured? * * * (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? * * * (4) Where lies the public interest? * * *' " *Internatl. Diamond Exchange Jewelers, Inc. v. U.S. Diamond & Gold Jewelers, Inc.* (1991), 70 Ohio App.3d 667, 672, 591 N.E.2d 881, quoting *Virginia Petroleum Jobbers Assn. v. Fed. Power Comm.* (C.A.D.C.1958), 259 F.2d 921, 925.

{¶ 37} The trial court concluded that Ulliman had proven a substantial likelihood of success because he did not engage in a "transfer," as defined by Bylaw 4–7–2, when he moved from Centerville High to Central High. Bylaw 4–7–2 provides:

{¶ 38} "If a student transfers after the first day of the student's ninth grade year or after having established eligibility prior to the start of school by playing in a contest (scrimmage, preview or regular season/tournament contest), the student will be ineligible for one year from the date of enrollment in the school to which the student transferred. A student is considered to have transferred whenever the student changes from that school in which the student was enrolled as a ninth grader to any other school regardless of whether the school from which the student transferred or to which the student transfers is a public or non-public, member or non-member or whether the high schools are within the same district."

{¶ 39} The trial court concluded that the second sentence of the bylaw narrowly defines the word "transfer," confining it to situations in which a student changes from the school in which the student was enrolled as a ninth grader to any other school. Because Ulliman did not transfer from Alter High School (his ninth grade school) to Central High School, the trial court held that Ulliman did not engage in a "transfer" for purposes of Bylaw 4–7–2.

{¶ 40} OHSAA concedes that the transfer provision could have been written more clearly. However, OHSAA says that it has consistently interpreted 4–7–2 to mean that any and all transfers after the first day of a student's freshman year trigger the one-year period of ineligibility. For example, OHSAA notes that it recently defended its transfer position in a situation where a student had attended one high school as a freshman, as a sophomore, and part of his junior year, had transferred elsewhere during his junior year, and had then transferred back into the first high school at the beginning of his senior year. See *Haineworth v. Ohio High School Athletic Assn.* (Oct. 9, 2008), Trumbull C.P. No. 2008 CV 02731. In *Haineworth,* the common pleas court concluded that the transfer bylaw is neutral on its face, is not arbitrary, and has a legitimate purpose.

{¶ 41} *Haineworth* is not particularly helpful, because the common pleas court did not discuss the specific facts of the case. The facts that we just mentioned are ones that OHSAA outlines in its brief—not facts that are actually discussed by the court in its decision. More important, *Haineworth* does not mention the wording of the transfer bylaw, and there is no indication that the common pleas court even considered the particular point at issue in the case before us. Our research also has not disclosed other Ohio cases that have considered the wording of Bylaw 4–7–2.

{¶ 42} Even if OHSAA has taken a consistent position on interpretation of the bylaw, the critical issue is whether OHSAA is mistaken in its interpretation. In *State ex rel. Ohio High School Athletic Assn. v. Judges of Stark Cty. Court of Common Pleas* (1962), 173 Ohio St. 239, 19 O.O.2d 52, 181 N.E.2d 261, the Supreme Court of Ohio held that OHSAA's decisions about its internal affairs "will, in the absence of mistake, fraud, collusion or arbitrariness, be accepted by the courts as conclusive." Id. at paragraph three of the syllabus.

{¶ 43} *State ex rel. Ohio High School Athletic Assn.* arose from a complaint to OHSAA about "undue influence" having been exercised to induce students to move to the Canton McKinley High School district. After investigating, OHSAA prohibited two students from playing football for Canton and also suspended Canton from interscholastic football for a year. Upon the application of the county prosecutor, the common pleas court issued a temporary restraining order prohibiting OHSAA and various school boards from enforcing the OHSAA order.

OHSAA responded by filing a petition for a writ of prohibition, in which it sought to prohibit the common pleas court from enforcing its temporary restraining order.

{¶ 44} The Supreme Court of Ohio first concluded that school boards have discretion to authorize their high schools to enter into agreements with OHSAA and that OHSAA, as a voluntary, private association, has standing to sue regarding these matters. Id., 173 Ohio St. at 244–247, 19 O.O.2d 52, 181 N.E.2d 261. The court then considered whether OHSAA's prohibition petition had stated a claim. In this regard, the court noted:

{¶ 45} " 'The decisions of any kind of voluntary society or association in disciplining suspending, or expelling members are of a quasi judicial character. In such cases the courts never interfere except to ascertain whether or not the proceeding was pursuant to the rules and laws of the society, whether or not the proceeding was in good faith, and whether or not there was anything in the proceeding in violation of the laws of the land. * * *' [quoting 4 American Jurisprudence at 466, Section 17].

{¶ 46} " * * * *

{¶ 47} "The respondents do not allege any mistake, fraud or collusion. The complaint of the respondents is that the penalty imposed by the association is too harsh. There is no allegation that it is arbitrary or any contention that it is not one provided for by the constitution and rules of the association. In fact, the uncontroverted allegations, that a hearing was held, that, following the imposition of penalty, a rehearing was granted, that everybody who wanted to be heard was heard, and that the penalty was affirmed, indicate that in no way was the action arbitrary." Id. at 248, 19 O.O.2d 52, 181 N.E.2d 261.

{¶ 48} The Supreme Court of Ohio concluded, therefore, that OHSAA's decision would be accepted in the absence of mistake, fraud, collusion, or arbitrariness. Id., 173 Ohio St. at 247–248, 19 O.O.2d 52, 181 N.E.2d 261. Since these factors were not present, the court allowed the writ of prohibition and prevented the common pleas court from circumventing OHSAA's order. Id. at 249–250, 19 O.O.2d 52, 181 N.E.2d 261.

{¶ 49} Unlike the factual situation in State ex rel. Ohio High School Athletic Assn., the case before us involves a claim that OHSAA's action was not covered by the rules and laws of the organization. The trial court specifically found that OHSAA had mistakenly interpreted the word "transfer," based on language found in the second sentence of Bylaw 4–7–2.

{¶ 50} Constitutions and bylaws entered into by an association and consenting parties constitute a contract between the association and its members. See Internatl. Bhd. of Elec. Workers, Local Union No. 8 v. Gromnicki (2000), 139

Ohio App.3d 641, 646, 745 N.E.2d 449, and *Ahmed v. Univ. Hosps. Health Care Sys., Inc.* (Apr. 18, 2002), Cuyahoga App. No. 79016, 2002 WL 664026, *6, and fn. 11. Regarding ambiguity in contracts, the Supreme Court of Ohio has said:

{¶ 51} "In recent years, Ohio courts have devoted many pages to discussions of whether contracts, ballot initiatives, statutes, or even constitutional provisions are ambiguous. * * * However, no clear standard has evolved to determine the level of lucidity necessary for a writing to be unambiguous. Some courts have reasoned that when multiple readings are possible, the provision is ambiguous. * * * The problem with this approach is that it results in courts' reading ambiguities into provisions, which creates confusion and uncertainty. When confronted with allegations of ambiguity, a court is to objectively and thoroughly examine the writing to attempt to ascertain its meaning. * * * Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed. Otherwise, allegations of ambiguity become self-fulfilling." *State v. Porterfield,* 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 11.

{¶ 52} Where ambiguity exists, parol evidence may also be considered in determining the intention of the parties to a contract. See, e.g., *Union Sav. Bank v. White Family Cos., Inc.,* 183 Ohio App.3d 174, 2009-Ohio-2075, 916 N.E.2d 816, at ¶ 24.

{¶ 53} We have examined Bylaw 4–7–2, and we find that it is ambiguous. Furthermore, while the trial court's interpretation is plausible at first glance, based on the wording of the transfer provision, the exceptions to the provision cast doubt on the trial court's interpretation, causing it, in our view, to be less tenable than OHSAA's contrary interpretation. OHSAA's evidence of intent also contradicts the trial court's interpretation, and Ulliman did not offer any parol evidence. We infer that the purpose of the provision is to prevent student-athletes from "shopping around" for a school to attend based solely upon a determination of which school will best showcase the student's athletic talents, which, in turn, would promote an atmosphere of athletic recruiting at the high school level. This purpose would best be served by a prohibition against all transfers not subject to one of the exceptions, not just an initial transfer from the school where the student began ninth grade.

{¶ 54} "[A]n abuse of discretion most commonly arises from a decision that was unreasonable." *Wilson v. Lee,* 172 Ohio App.3d 791, 2007-Ohio-4542, 876 N.E.2d 1312, at ¶ 11. "Decision[s] [are] unreasonable if [they are not supported by a] sound reasoning process." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. The trial court's interpretation is not based on sound reasoning, because it would allow transfers at any time and for any reason, after one transfer had occurred from the school in which a student is enrolled in ninth grade. If this interpretation

were correct, there would be no need for OHSAA to include many of the transfer exceptions. The trial court's interpretation is also inconsistent with what we infer to be the purpose of the transfer provision. And finally, Ulliman did not present any evidence disputing or contradicting OHSAA's evidence as to the purpose and interpretation of its rules.

{¶ 55} As OHSAA points out in its brief, Exceptions 6, 7, and 11 contemplate situations in which a student has previously transferred, or has been granted an eligibility exception. For example, Exception 6 states:

{¶ 56} "A student shall be entitled to one transfer into a public high school located in the public school district within which the student's parent residence is located except that such a transfer shall not be permitted if the student has previously utilized the superintendent's agreement which was previously set forth in exception 6 to transfer from that same public high school."

{¶ 57} Likewise, Exception 11 allows students to become eligible if their school ceases to sponsor an interscholastic athletic program, but does not permit Exception 6 (transfer into residential district) to be used thereafter, once a transfer under Exception 11 has become effective.

{¶ 58} While multiple transfers could potentially occur during a single school year, that scenario is unlikely. Moreover, OHSAA's stated goals include the protection of students and schools from exploitation and the establishment of standards for competition and sportsmanship. OHSAA Constitution, Article 2–1–1. Associate Commissioner Moore also testified that the primary purpose of the eligibility bylaws is to provide fair and equitable rules for the 350,000 Ohio students who participate in interscholastic athletics. In light of these goals, it is unreasonable to conclude that the rules only prohibit initial transfers from a student's ninth grade school to another school. Under the trial court's interpretation, students could change schools freely for purposes of competing in a more advantageous program without running afoul of OHSAA rules, once they have made an intermediate transfer to a school other than the school in which they were enrolled in ninth grade. If the trial court's interpretation of the rule were to stand, we can envision a scenario in which a stellar athlete might enroll in ninth grade, transfer after establishing his ninth grade school, spend the next year in club sports receiving individual training, and then, after the one-year restriction has run its course, freely move from school to school, based upon which school might best showcase his talents in that season's sport, or which school's athletic boosters might offer the greatest incentives for the star athlete to attend that school.

{¶ 59} The trial court also concluded that Ulliman was likely to succeed on the merits, because OHSAA acted arbitrarily in applying Exception 2. The

court found that this exception would easily apply, but for the fact that Ulliman had turned 18 years old in July 2008. Exception 2 states:

{¶ 60} "If the student is the ward of a court-appointed guardian, and there is a subsequent change in that guardian, the student shall be eligible in the district of residence of the new guardian or at any non-public school provided the student lives with the guardian. Likewise, if the student is a child or parents who are either divorced or have had their marriage dissolved or annulled and there is a court-ordered change of custody, the student shall be eligible in the district of residence of the new custodial parent or at any non-public school provided the student lives with the new custodial parent. For purposes of this exception, the term 'parent' means the biological or adoptive parents of the student or, as the case may be, the person to whom parenting rights and responsibilities have been allocated pursuant to court order. In the event a student has been temporarily or permanently removed from the home, 'parent' means the person or governmental agency with legal or permanent custody."

{¶ 61} As a preliminary matter, we agree with OHSAA that the right to participate in interscholastic athletics is not constitutionally protected. *Menke v. Ohio High School Athletic Assn.* (1981), 2 Ohio App.3d 244, 246, 2 OBR 266, 441 N.E.2d 620. Ulliman has also not suggested that he is a member of any constitutionally protected group. The claim of arbitrariness, therefore, is not evaluated under constitutional standards, but is governed by *State ex rel. Ohio High School Athletic Assn.*, 173 Ohio St. 239, 19 O.O.2d 52, 181 N.E.2d 261, which holds that OHSAA internal-affairs decisions will be accepted as conclusive, in the absence of arbitrariness. The Ohio Supreme Court did not specifically define "arbitrariness" in this context. In *Menke*, the court of appeals rejected a claim of arbitrariness where an OHSAA rule declared Ohio nonresident students ineligible to participate in Ohio interscholastic athletics. The court noted that the rule had been adopted properly, in compliance with OHSAA regulations. 2 Ohio App.3d at 247, 2 OBR 266, 441 N.E.2d 620.

{¶ 62} The Supreme Court of Ohio has also defined "arbitrary" in other contexts as " 'without adequate determining principle; * * * not governed by any fixed rules or standard.' " *Dayton ex rel. Scandrick v. McGee* (1981), 67 Ohio St.2d 356, 359, 21 O.O.3d 225, 423 N.E.2d 1095, quoting Black's Law Dictionary (5th Ed.). Accord *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 22, 552 N.E.2d 202.

{¶ 63} No evidence was presented in the trial court to indicate that Exception 2 was improperly adopted in violation of OHSAA regulations, nor is there any evidence that Exception 2 is without adequate determining principles. While the rule may restrict students who cannot qualify for a change of custody due to their age, Ulliman failed to demonstrate that the rule is not rationally based.

{¶ 64} Moore, the OHSAA Commissioner, testified that OHSAA has encountered situations where students born a day or two before a cut-off are ineligible. Moore indicated that OHSAA has litigated this issue in the past and has prevailed. Moore also stated that OHSAA has made a fundamental change by applying waivers for children with disabilities who may be over the age limit. However, the general rule is designed to protect students to make sure they are not playing against students who are 19 or 20 years of age. Moore denied applying the bylaws inconsistently in the present case, or performing her work arbitrarily.

{¶ 65} In concluding that Exception 2 is arbitrary, the trial court did not rely on facts or evidence showing irregularity in the rule-making or decision processes. The court, instead, apparently relied on its own opinion that the rule could easily cover Ulliman, but for the fact that he was 18 years old. This does not satisfy the arbitrariness requirement.

{¶ 66} In *Crane by Crane v. Indiana High School Athletic Assn.* (C.A.7, 1992), 975 F.2d 1315, the Seventh Circuit Court of Appeals held that a state athletic association had acted arbitrarily and capriciously in applying its divorce-transfer rule to a situation where the parents had changed custody of a child, who was then declared ineligible. The Seventh Circuit noted that if the rule were unambiguous or if the association had interpreted and applied the rule consistently, "no court could interfere." Id. at 1325. The reasons for finding arbitrary application included the fact that the rule was poorly drafted, since various key phrases were undefined. Id. However, the Seventh Circuit stressed that this would not have been fatal, if the association had "used the common meaning of these terms or interpreted the terms consistently." Id. However, testimony of the association's commissioner indicated that the association had no consistent idea what the words in the rule meant. Id.

{¶ 67} The Seventh Circuit also noted that the association's interpretation of the rule seemed to change with the situation at hand and seemed designed to allow the association to declare students ineligible or to achieve a pre-ordained result. Id. Finally, the Seventh Circuit concluded that the inconsistency was aggravated by the association's failure to publish written opinions or reasoning for eligibility decisions. As a result, high schools, parents, or students had no guidance and could not make fully informed decisions. Id.

{¶ 68} The evidence presented in this case does not suggest that OHSAA acted arbitrarily, that OHSAA had no idea what the terms in Bylaw 4–7–2 and its exceptions mean, or that OHSAA applied the bylaw and its exceptions inconsistently. In fact, Moore's testimony indicates that OHSAA applies the rules consistently. There is also no evidence that OHSAA deviated from its own procedures in adopting or implementing the exception.

{¶ 69} As a further matter, we note that OHSAA's general age-limit regulation, which restricts students to eight consecutive semesters of athletic participation, has previously been upheld. See *Rhodes v. Ohio High School Athletic Assn.* (N.D.Ohio 1996), 939 F.Supp. 584, 589. Like Exception 2, the age-limit regulation may prevent some students from playing interscholastic sports. However, the fact that an occasional student may be prevented from playing does not mean that the rule is arbitrary. The exceptions to Bylaw 4–7–2 provide many ways to legitimately qualify for eligibility, and OHSAA is not required to anticipate every situation. In addition, Ulliman failed to present evidence that OHSAA arbitrarily applied the custody-change exception.

{¶ 70} We conclude that the trial court erred when it found that Ulliman had a substantial likelihood of succeeding on the merits. The remaining prongs of the preliminary injunction standard do not need to be discussed, because a finding in Ulliman's favor on the likelihood of success is required to justify "intrusion into the ordinary processes of administration and judicial review." *Internatl. Diamond Exchange Jewelers, Inc.*, 70 Ohio App.3d at 672, 591 N.E.2d 881.

{¶ 71} OHSAA's first assignment of error is sustained.

III

{¶ 72} OHSAA's second assignment of error is as follows:

{¶ 73} "The trial court's order enjoining the Ohio High School Athletic Association from prohibiting appellee from (1) participating in interscholastic athletics during his senior year at Central and (2) taking adverse action against either the appellee or Central for allowing the appellee to participate in interscholastic athletics during his senior year at said high school was against the manifest weight of the evidence, an abuse of discretion and contrary to law."

{¶ 74} Under this assignment of error, OHSAA contends that the trial court's decision is against the manifest weight of the evidence, an abuse of discretion, and contrary to law, because Ulliman failed to prove the elements required for a preliminary injunction by clear and convincing evidence. The elements to be weighed in granting preliminary injunctions are the petitioner's likelihood of success, the probability of irreparable harm to the petitioner if relief is not granted, the harm caused to the other parties by the issuance of a stay, and whether public interest will be served by an injunction. *Internatl. Diamond Exchange Jewelers, Inc.*, 70 Ohio App.3d at 672, 591 N.E.2d 881.

{¶ 75} Ulliman's failure to prove that he is likely to succeed on the merits—the subject of Part II of this opinion, above—is a critical failure. This failure leads to the conclusion that the trial court's decision is against the weight of the evidence

and is an abuse of discretion. Accordingly, we need not consider the remaining portions of OHSAA's argument.

{¶ 76} OHSAA's second assignment of error is sustained.

## IV

{¶ 77} OHSAA's first and second assignments of error having been sustained, the preliminary injunction issued against it is reversed and vacated.

Judgment reversed.

FROELICH and HARSHA, JJ., concur.

WILLIAM H. HARSHA, J., of the Fourth Appellate District, sitting by assignment.