CITY OF DAYTON, EX REL. SCANDRICK, APPELLEE, *v.* CITY OF DAYTON MAYOR McGEE ET AL., APPELLANTS.

[Cite as Dayton, ex rel. Scandrick, v. McGee (1981), 67 Ohio St. 2d 356.]

(No. 80-1564—Decided July 29, 1981.)

*Messrs. Pickrel, Schaeffer & Ebeling, Mr. William L. Havermann* and *Mr. Frank M. Root,* for appellee.

*Mr. Thomas G. Petkewitz,* city attorney, and *Mr. Thomas P. Randolph,* for appellants.

*Per Curiam.* Unless all bids are rejected, Section 35.13 of the Dayton Revised Code of General Ordinances requires that contracts be awarded to the "lowest and best" bidders.[1] The sole issue before this court is whether the appellants' use of the

---

[1] "§35.13 *CONTRACT AWARDING PROCEDURE.*

"(A) Unless the director of the department in charge of the work rejects all the bids, he shall certify which is the lowest and best bid and transmit the proceedings to the City Manager, who, if he approves the making of a contract upon such bid, shall transmit the proceedings to the City Attorney. In determining which is the lowest and best bid, the director shall give consideration to the affirmative action program submitted in accordance with § 35.16 with particular attention to the probable effectiveness of such program in insuring minority group representation in all trades and all phases of the bidder's operation. The director shall further give consideration to whether the bidder is a minority-owned firm, and the number of minority persons such bidder employs.***"

unannounced residency criterion in determining which bid was "lowest and best" constitutes an abuse of discretion. Were the question simply one of which bid was lowest, the answer would be clear.[2] Appellants, however, were not required to award the contract to the lowest bidder; rather, they were empowered to make a qualitative determination as to which bid was both lowest and "best."

In reaching their decision, as to which bid was lowest and best, appellants were required by ordinance to consider only the bidder's affirmative action program and its "probable effectiveness." Appellants had "no problems" with the affirmative action programs of either Fryman-Kuck or Schroeder. Additionally, it was acknowledged that both bidders were capable of performing the contract in an acceptable manner. Thus, in these important areas, the qualifications of Fryman-Kuck and Schroeder were identical. The contractors differed in only one respect—Schroeder was a "resident" of the city of Dayton, whereas Fryman-Kuck was not.[3]

Appellants argue that, in the exercise of their sound discretion, they were entitled to consider and give controlling weight to the fact that Schroeder was a city "resident." Appellants, through the city deputy director of law, advanced, as the rationale for favoring "resident" bidders, the assertion that such bidders offered "year-round employment with the city and***[paid] city income and property taxes. The permanent tax base provided by companies situated within the city is an essential element in the city's ability to provide necessary municipal services to its citizens." In support of this contention, the director of the city's department of urban development stated that it was one of the city's "premier policies" to encourage businesses to locate within the city and, in furtherance of this policy, appellants awarded contracts to businesses which did locate within the city. The Court of Appeals held that utilization of the unannounced criterion of residency

---

[2] This is true notwithstanding the opinion of the appellants that the difference between the bids was "insubstantial" or, as stated by the trial court, that the bids were "substantially the same."

[3] Fryman-Kuck General Contractors, Inc., listed its "[h]ome office address" as Brookville, Ohio.

constituted an abuse of discretion. For the reasons set forth below, we agree.

"The meaning of the term 'abuse of discretion'***connotes more than an error of law or of judgment; it implies an unreasonable, arbitrary or unconscionable attitude***." *Steiner* v. *Custer* (1940), 137 Ohio St. 448, paragraph two of the syllabus; *Conner* v. *Conner* (1959), 170 Ohio St. 85; *Rohde* v. *Farmer* (1970), 23 Ohio St. 2d 82; and *State* v. *Adams* (1980), 62 Ohio St. 2d 151. "Arbitrary" means "without adequate determining principle;***not governed by any fixed rules or standard." Black's Law Dictionary (5 Ed.). "Unreasonable" means "irrational." *Id.* Under the facts of the instant cause, we find appellants' actions to have been both arbitrary and unreasonable.

Despite the purported primacy of the policy to prefer resident bidders, appellants did not announce or disclose the existence of such policy to the bidders *until after the bids were opened.* It appears, therefore, that appellants made a conscious decision to withhold this pertinent information until after they had actual knowledge of the amounts of the bids. In effect, appellants modified their requirements without notice. This action tended to undermine the integrity of the competitive bidding process. See *Boger Contracting Corp.* v. *Board* (1978), 60 Ohio App. 2d 195.

Moreover, the record demonstrates no logical nexus between appellants' goal of increasing the city's tax base and their decision to award the contract to Schroeder. On the state of the record, it is impossible for appellants to have reached any reasonable conclusion that would justify the deference shown Schroeder.[4] The arbitrary nature of appellants' decision

---

[4] Schierloh's testimony on this point demonstrates the absence of any logical or rational connection between the espoused purposes for awarding contracts to "resident" bidders and the decision to award the contract in question to Schroeder. Schierloh stated, in part, that when "making a determination" based upon "city residency," the city considers "the location of the home office***and the fact there is a work force employed there within the city full time, year round office personnel and staff, etc." It is difficult to determine from what source the appellants derived these "facts" regarding Schroeder's work force, since Schierloh also testified that it was beyond the city's "ability or discretion" to determine the residency of the bidder's employees, nor did Schierloh speak with Schroeder or visit its offices to ascertain whether there was a full-time, "year round" staff employed. It further appears that the only source for

is illustrated by the following testimony presented at the hearing on the injunction:

"[Appellants' counsel Mr. Randolph] Q. Now here again I might be engaging in speculation but, or asking you to, when you say to award contracts to business, that is not in every circumstance, is it?

"[Schierloh] A. No it's not.

"[Objection.] * * *

"MR. RANDOLPH: The point is, your honor, the recommendation was made by the department director here and we would not want to leave the court with the impression that he always recommends the contract go to the local bidder and the question is if the difference in the award were, say ten percent, what his recommendation would be, would his recommendation be the same?* * *

"[Schierloh] A. Well if you, if the items have been entered and as we state, the difference is approximately one half of one percent difference, we'd recommend we go this way. *If the difference were many percentages greater than that, I would not say we at all could recommend that to the department or City Manager for approval, in fact, we have not in the past done that.*" (Emphasis added.)

The evil here is not necessarily that "resident" bidders are preferred but that there are absolutely no guidelines or established standards for deciding by how "many percentages" a bid may exceed the lowest bid and yet still qualify as the "lowest and best" bid. Absent such standards, the bidding process becomes an uncharted desert, without landmarks or guideposts, and subject to a city official's shifting definition of what constitutes "many percentages." Neither contractors nor the public are well served by such a situation.

While municipal governing bodies are necessarily vested with wide discretion, such discretion is neither unlimited nor unbridled. The presence of standards against which such discretion may be tested is essential; otherwise, the term "abuse of discretion" would be meaningless. In its opinion, the

Schierloh's opinion that Schroeder was a "resident" of the city, and the basis for his recommendation, was Schroeder's "[h]ome office address" as reflected on the "bidder's proposal" and the fact that Schierloh had driven by this address "many times" and observed the building located at that address.

trial court stated that: "***[t]he lack of an announced standard and priority of miscellaneous considerations allows unbridled discretion and political favoritism." We find neither allegation nor proof of political favoritism. However, we do find, due to the lack of announced standards, that appellants' action in this case was arbitrary. Accordingly, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

STEPHENSON, P. BROWN, SWEENEY, LOCHER, HOLMES and C. BROWN, JJ., concur.

CELEBREZZE, C. J., dissents.

STEPHENSON, J., of the Fourth Appellate District, sitting for W. BROWN, J.

CELEBREZZE, C. J., dissenting. Since, in my estimation, relator has failed to establish his standing to even argue the merits of whether the city commission abused its discretion in awarding the contract to Leo B. Schroeder, Inc., I respectfully dissent.

The majority opinion, conveniently, omits the critical consideration in this case—that Scandrick, the relator, is an employee of Fryman-Kuck, the unsuccessful bidder.

However, since relator has characterized his suit as a taxpayers' action, pursuant to R. C. 733.56 through 733.59, the threshold issue is what harm, if any, has been done to the *public* by the awarding of the contract to Leo B. Schroeder, Inc.

A plaintiff, in bringing a taxpayers' action, is exercising a privilege which is only exercisable in a public capacity. *Trustees of Prairie Twp.* v. *Garver* (1931), 41 Ohio App. 232. A taxpayers' action which is brought for the sole purpose of serving the private interest of another person cannot be maintained. It is beyond dispute that an Ohio court will not grant relief to a taxpayer who is a mere figurehead for an unsuccessful bidder. *Roberts* v. *Columbus* (1913), 15 N.P. (N.S.) 297. See, generally, *State, ex rel. Nimon,* v. *Village of Springdale* (1966), 6 Ohio St. 2d 1; *Andrews* v. *Ohio Building Authority* (1975), 74 Ohio Op. 2d 184 (Holmes, J.). Indeed, R. C. 733.56 through 733.59 only contemplate a taxpayers' action in the

face of the misapplication of public funds, abuse of corporate powers, fraud, or corruption, elements which are clearly inapplicable to the case at bar.

Applying the foregoing principles to the facts *sub judice,* it is immediately evident that relator is not suing under the guise of the public-spirited citizen-watchdog, but rather, as a figurehead for the unsuccessful bidder who is now attempting to secure collateral review of the bidding process. This we should refuse to legitimatize. Conspicuous by its absence from relator's complaint and brief are allegations of public harm, resulting from the misapplication of public funds, abuse of corporate powers, fraud, or corruption. Relator's only claim is that Fryman-Kuck was adversely affected by the contracting process.

This court has recently and emphatically stated that we do not sit as a super board of zoning appeals. *Peachtree Development Co.* v. *Paul* (1981), 67 Ohio St. 2d 345; see *Leslie* v. *Toledo* (1981), 66 Ohio St. 2d 488; *Brown* v. *Cleveland* (1981), 66 Ohio St. 2d 93. Yet the majority's philosophy will thrust this court into the role of a super board of contract appeals, reviewing, clause by clause, the provisions of the thousands of contracts which are let by the public bodies of this state every year. The majority's approach threatens to mature into a judicial Midas, roaming through all contracts and turning everything that it touches into an actionable taxpayers' claim. For me, this lack of standing is too high a hurdle to leap and, accordingly, I dissent.