[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Adams v. Harris*, Slip Opinion No. 2024-Ohio-4640.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-4640

ADAMS ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* HARRIS, TAX COMMR., APPELLEE AND CROSS-APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Adams v. Harris*, Slip Opinion No. 2024-Ohio-4640.]

*Taxation—Real-property tax—Current-agricultural-use valuation—Tax commissioner abused her discretion by unreasonably and arbitrarily adopting $1,000 per acre woodland-clearing-cost rate—Decision of Board of Tax Appeals reversed and cause remanded to tax commissioner with instructions that she adopt woodland-clearing-cost rate that complies with Adm.Code 5703-25-33.*

(No. 2023-0733—Submitted April 9, 2024—Decided September 26, 2024.)

APPEAL from the Board of Tax Appeals, Nos. 2015-1090, 2016-1061, 2017-1867, 2018-1143, 2019-1632, 2020-1347.

_____

STEWART, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, DONNELLY, BRUNNER, and DETERS, JJ., joined.

**STEWART, J.**

{¶ 1} Appellants and cross-appellees, a group of landowners, appeal from a decision of the Board of Tax Appeals ("BTA") that affirmed six journal entries issued by appellee and cross-appellant, the Tax Commissioner of Ohio, Patricia Harris. Each of the six entries issued by the tax commissioner adopts a valuation table to be used by Ohio's county auditors in assessing land that qualifies for "current agricultural use valuation" ("CAUV"), and each entry relates to a different tax year for years 2015 through 2020. The valuation table in each of the entries sets a clearing-cost rate of $1,000 per acre for woodlands—an amount that must be deducted by county auditors from the per-acre value of woodland to determine the woodland's agriculture-use value. On appeal to this court, as on appeal below to the BTA, the landowners claim that the $1,000 clearing-cost rate adopted by the tax commissioner in each of the six entries is too low and that the tax commissioner has ignored evidence proving that the rate should be higher. The landowners claim that because the clearing-cost rate is too low, their woodlands are overvalued, causing them to pay more property tax than appropriate for the land.

{¶ 2} For the reasons that follow, we reverse the BTA's decision upholding the tax commissioner's entries setting the $1,000 rate and remand the cause to the tax commissioner for further, evidence-based consideration of an appropriate value for the clearing-cost rate for woodlands.

## I. BACKGROUND

### A. Overview of the CAUV program

{¶ 3} The origins of this case trace back to *Adams v. Testa*, 2017-Ohio-8853, a case in which many of the same landowners to the present appeal had challenged the tax commissioner's journal entry for tax year 2015 concerning the $1,000 clearing-cost rate for woodlands. At issue in *Adams v. Testa* was the BTA's decision that the tax commissioner's 2015 CAUV entry was not appealable under

R.C. 5717.02(A) as a "final determination." We reversed the BTA's decision and remanded the matter to the BTA for further proceedings, holding that the entry was a final determination within the meaning of the statute. *Adams* at ¶ 32. In rendering our decision, we explained the CAUV program as follows:

In 1974, the Ohio Constitution was amended to allow "land devoted exclusively to agricultural use [to] be valued for real property tax purposes at the current value such land has for such agricultural use." Ohio Constitution, Article II, Section 36. As a consequence, agricultural land is taxed based on its agricultural-income potential as opposed to its fair market value. To accomplish this valuation, the tax commissioner is required to adopt rules to determine the "current agricultural use value" of such land. R.C. 5715.01(A). The rules are to take into account soil productivity, crop-price patterns, capitalization rates, farmland market values, and other pertinent factors. *Id.*

Pursuant to this directive, the tax commissioner adopted rules setting forth a method by which the commissioner, in consultation with an agricultural advisory committee, sets CAUVs on an annual basis. *See* Ohio Adm.Code 5703-25-30 through 5703-25-36. The CAUVs are finalized by the tax commissioner's adoption of an administrative journal entry. Ohio Adm.Code 5703-25-31(D). The county auditors then use the CAUVs "as prima-facie correct valuation for parcels or tracts of land devoted exclusively to agricultural use." Ohio Adm.Code 5703-25-31(E).

Included in the definition of agricultural land is land upon which timber is grown that is part of or next to farmland. R.C. 5713.30. To value such woodland, the tax commissioner calculates

a cost to clear the land to convert it to cropland. *See* Ohio Adm.Code 5703-25-33(M)(4). The clearing cost is then subtracted from the cropland value to determine the woodland value. *Id.*

The CAUVs are set forth in a table that is promulgated by the tax commissioner each year. Ohio Adm.Code 5703-25-31(D). The table establishes a per-acre CAUV for both cropland and woodland for each soil type in Ohio.

(Brackets added in *Adams*.) *Id.* at ¶ 4-7.

**{¶ 4}** From 1983 to 2014, the tax commissioner applied a clearing-cost rate of $500 per acre for woodlands. In 2015, the tax commissioner adjusted the rate, doubling it to $1,000. The tax commissioner has carried that rate through to 2020. As the challenge to the 2015 journal entry progressed before the BTA following our remand in *Adams*, additional landowners were joined as parties to the proceedings, and together the landowners continued to appeal the tax commissioner's journal entries that she had entered for the ensuing years. These separate appeals were consolidated by the BTA. Thus, by the time the BTA entered its decision in this case, it had before it challenges to the tax commissioner's 2015, 2016, 2017, 2018, 2019, and 2020 journal entries, and those challenges included new landowners as party plaintiffs in addition to those landowners who had brought the initial challenge in *Adams v. Testa*.

*B. The BTA's merit hearing*

**{¶ 5}** The BTA convened a merit hearing during which the parties presented their arguments and offered documentary exhibits and witness testimony. What follows is a description of the evidence furnished to the BTA with respect to each CAUV entry that the tax commissioner issued for tax years 2015 through 2020.

### 1. Tax year 2015

{¶ 6} The landowners presented testimony from a former employee of the Ohio Department of Taxation ("the department"), Gloria Gardner, who had worked at the department from 1999 until her retirement in January 2021. While there, Gardner worked specifically on the CAUV program in the Division of Tax Equalization—the division that runs the CAUV program—from approximately 2009 through 2020. During her testimony, Gardner described the process behind the tax commissioner's adoption of the $1,000 clearing rate for woodlands and her involvement in that process, including communications she had had with others in the division and with interested parties.

{¶ 7} Gardner testified that in November 2014, she emailed John Dorka, who was the executive director of the Ohio Forestry Association at that time, advising him that the tax commissioner was researching whether to increase the clearing-cost rate for woodlands and asking him if he could provide documents on the topic. The Ohio Forestry Association is a member of the agricultural advisory committee created under Adm.Code 5703-25-32(A), which "annually advise[s] the tax commissioner on economic, technological and other current developments that might be considered in the determination of agricultural land values." Dorka informed Gardner that, based on a survey of the association's members who provided clearing services, a proper clearing-cost rate would be between $2,200 and $4,500 per acre. Gardner told Dorka that she found the information he provided "helpful" and advised him that a "focus" of the 2015 agricultural advisory committee meeting would be on revising the clearing-cost formula.

{¶ 8} In January 2015, Gardner prepared a spreadsheet summarizing the proposed changes to the CAUV program for the purpose of the tax commissioner's 2015 journal entry. She proposed that the clearing-cost rate be increased "from $500 to $1,000 based on a survey showing average clearing costs of $3,350/acre and the ratio of cropland value to [United States Department of Agriculture

("USDA")] market value (30%)." In response to Gardner's proposal, Shelley Wilson, an executive administrator who oversaw the Tax Equalization Division of the Department of Taxation, sent an email to Gardner stating:

> The only thing I'm not comfortable with is the rationale for setting the clearing costs at $1,000 an acre. While I think there's certainly truth in what you say, I don't think we will be able to defend artificially reducing the cost to clear—at least not in writing. Maybe what we should do is use a higher figure and raise the minimum value.

{¶ 9} Gardner testified at the BTA hearing that she could not recall the rationale behind her proposal to increase the clearing-cost rate from $500 to $1,000 based on the 30-percent ratio of cropland value to USDA market value. Indeed, when Gardner responded to Wilson's email, Gardner recognized the perceived difficulty in generating a clearing-cost rate for woodlands and joked, "For the deduction . . . put them on a dart board!" (Ellipsis in original.)

{¶ 10} In March 2015, Gardner received the results of a survey conducted by one of the landowners in this case, David Coldwell, a timber consultant who advises landowners on woodlands management. Coldwell reported an average clearing-cost rate of $3,587.50 to $4,000 per acre based on information he had received from eight land-clearing companies.

{¶ 11} In June 2015, the tax commissioner selected a clearing-cost rate of $1,000, which, according to a May 2015 table that summarized the changes for tax year 2015, was "based on input from [the] advisory committee." During her testimony before the BTA, Gardner could not recall any specific committee member that had recommended that rate for adoption. But she stated that the department had been presented with a range of clearing-cost data from around $800

6

on the low end to around $4,000 to $5,000 on the high end. According to Wilson's testimony, the low-end data that Gardner referred to came from an email Gardner had received from the Ohio Farm Bureau Federation, on which Wilson had been copied, that specified a low-end price range of $800 to $1,000 per acre to clear woodland. Wilson testified, however, that she did not regard the low-end figures as reliable.

{¶ 12} At the hearing, Wilson could not identify any person or organization that provided the tax commissioner with reliable data showing a clearing-cost rate of $1,000 or less. According to Wilson, the most that the department could deduce was that $500 was too low. As Wilson testified: "[W]e looked at the survey data and found nothing that came from the market that we felt we could rely on. And so exercising the Tax Commissioner's discretion in this matter we doubled the 500 to a thousand."

## 2. Tax year 2016

{¶ 13} At a March 2016 advisory-committee meeting, the Ohio Farm Bureau Federation submitted a memorandum characterizing the increase to the clearing-cost rate from $500 to $1,000 as a "step in the right direction" while also emphasizing that the increase "by no means went far enough to account for the true costs of clearing and draining land." Around this time, Stan Dixon, a department official with supervisory authority over those involved in calculating CAUV values, conveyed to Brad Perkins, who by that time was the executive director of the Ohio Forestry Association, that the department was interested in obtaining payment receipts for land-clearing work to develop a better understanding of what the clearing-cost rate should be.

{¶ 14} In May 2016, Perkins presented the department with information drawn from seven payment receipts to Miller Logging, Inc., a land-clearing company, which showed an average clearing cost for woodland of $3,785 per acre. Perkins testified that representatives from the department told him that he had

provided "good information" and that they would "take [the information] under consideration to possibly make changes to the amount."

**{¶ 15}** In early June 2016, Gardner received information from the United States Department of Agriculture, which had obtained information from the Wyandot County Soil and Water Conservation District, showing that a project had been cleared for $4,179 per acre. Regardless, later that month, the tax commissioner issued an entry retaining the $1,000 rate. None of the information that Perkins provided or that Gardner received showed that woodland had been cleared for $1,000 per acre.

### 3. Tax year 2017

**{¶ 16}** In March 2017, after being told by a department representative that the evidence he had previously presented was insufficient because it had come from only one land-clearing company, Perkins provided information to the department from another company, Berne Reclamation, that had performed three woodland-clearing projects. After combining those three projects with the projects he had submitted in 2016, Perkins was able to show an average clearing cost of $3,659.65 per acre. At the next advisory committee meeting, Perkins received feedback that this information was "excellent." Nevertheless, Perkins testified that following the meeting, department personnel told him that he "probably needed to quit bringing this [issue] up at the committee meetings because it wasn't going to change." The tax commissioner issued an entry in August 2017 retaining the $1,000 figure.

### 4. Tax years 2018, 2019, and 2020

**{¶ 17}** For the 2018 and 2019 tax years, the department did not receive additional clearing-cost information or survey any land-clearing companies to determine their rates. In June 2018, the tax commissioner issued an entry for tax year 2018, again retaining the $1,000 rate. The results for the following year were the same: in July 2019, the tax commissioner issued an entry for tax year 2019 retaining the $1,000 rate.

8

**{¶ 18}** In April 2020, Perkins emailed Gardner's successor, Jacqueline St. John, in response to St. John's email that had distributed preliminary CAUV values for 2020 to the Agricultural Advisory Committee members and asked for member feedback on the proposed values. Perkins' email questioned why the department annually updates "all the other numbers in the [CAUV] formulas" except for woodland-clearing costs. He also gave an overview of the Ohio Forestry Association's position on the department's decision not to update clearing costs for woodlands. He stated:

The current situation that Ohio and the nation are going through with COVID-19 has pointed dramatically to the importance of maintaining our productive forest lands in forests. Toilet paper is flying off the shelves, people are having more things shipped in boxes directly to their homes to avoid in-person shipping. Much needed medical equipment and supplies, food, and other essential items are being shipped on wooden pallets all over the country. All of these things and more come from our productive forests.

We need a tax structure for our forest lands that encourages people not to convert it to other uses. But, when you only have a harvest with income once every few decades, it can be hard to convince some people not to take the quick money from housing developers and the like, if they are continually paying taxes on property with no income for decades. That is why the land clearing cost was originally put in the formula, to keep the taxes at a low enough point that people would keep their forests in forests.

. . . Ohio went from being 90-95% forested in the days of the first settlers, to a low of only 10% by around the year 1900. It had all been cleared for farming and other uses. It took until 1990 for

that number to increase back to around 30%, as many of the old non-productive hill farms were abandoned for farming and reverted back [sic] to forests. That number has been steady now for 30 years. However, there is only so many more old farms that can revert back [sic] to forest, and there is forested acreage being cleared every day for the next housing development, highway, or industrial complex. We are going to start losing forested acreage in the very near future if we don't do something to keep people from converting it. The Ohio Department of Tax Equalization can do their part by updating the formula with real data.

Lastly, the Department likes to use numbers from Ohio State University in their [sic] calculations, so keep in mind that the OSU Forest Economist recognizes the Forest Products Industry in Ohio as having more than a $26 Billion total economic impact in the state.

It appears from the record that Perkins never received a follow-up response to his email from the department.

**{¶ 19}** As with the two earlier years, the department did not receive additional clearing-cost information or survey land-clearing companies to determine what they charged to clear woodland. In July 2020, the tax commissioner issued an entry for tax year 2020 retaining the $1,000 rate.

*C. The BTA's decision upholding the six journal entries*

**{¶ 20}** In a decision issued on May 9, 2023, the BTA upheld each of the six journal entries issued by the tax commissioner containing a clearing-cost rate of $1,000 for woodlands. Specifically, the BTA concluded that under the standard announced by this court in *Johnson v. McClain*, 164 Ohio St.3d 379, the tax commissioner had not abused her discretion in setting the clearing-cost rate at $1,000. BTA Nos. 2015-1090, 2016-1061, 2017-1867, 2018-1143, 2019-1632,

10

2020-1347, 2023 WL 3433584, *7-8 (May 9, 2023). The BTA explained, "Adopting the Advisory Committee's recommended $1,000 clearing cost deduction was well within her discretion." *Id.* at *7. In reaching its decision, the BTA rejected the tax commissioner's argument that for some of the years at issue, some of the landowners lacked standing to bring their challenge. *Id.* at *5. The BTA determined that this court's decision in *Adams v. Testa*, 2017-Ohio-8853, was adequate to resolve the standing question because that opinion found that the landowners had standing to challenge the 2015 CAUV entry and there was no indication that the landowners who had been added to the ensuing appeals were not owners of property for purposes of challenging a CAUV entry. BTA Nos. 2015-1090, 2016-1061, 2017-1867, 2018-1143, 2019-1632, 2020-1347, 2023 WL 3433584, at *5.

{¶ 21} The landowners appealed to this court, asserting two propositions of law:

> Proposition of Law No. 1: The BTA acted unlawfully and unreasonably by upholding the commissioner's utilization of a woodland clearing cost of $1,000 per acre in the commissioner's calculation of CAUVs for woodlands without reliable and probative evidence to support that figure for the years of 2015 through 2020.
>
> Proposition of Law No. 2: The BTA acted unlawfully and unreasonably by upholding the commissioner's use of a woodland clearing cost of $1,000 per acre to calculate CAUVs for woodlands from 2015 through 2020 despite the commissioner's failure to annually obtain [and] collect accurate and reliable land clearing cost data from the information sources listed in Ohio Adm.Code 5703-25-33(D) as required by Ohio Adm.Code 5703-25- 33(A) and (D), despite the commissioner's failure to annually obtain land clearing

data from the best available sources as required by Ohio Adm.Code 5703-25-33(A) and (J), and despite the commissioner's failure to annually calculate CAUVs that are accurate, reliable, and practical and that are the product of careful attention to the many principles and techniques involved as required by Ohio Adm.Code 5703-25-33(B).

{¶ 22} The tax commissioner cross-appealed, raising the following three propositions of law:

Proposition of Law No. [1]: Where an individual appellant seeks to appeal a given year's CAUV Table, but that year's CAUV Table does not apply to the county in which that appellant's property resides, then that appellant is not a "taxpayer" under R.C. 5717.02(A) with respect to that year's CAUV Table, and therefore the BTA lacks jurisdiction over that appellant's claims with respect to that year's CAUV Table.

Proposition of Law No. [2]: Where an individual appellant does not advance his challenge to a given year's CAUV Table at the earliest available opportunity, at public hearing before the Commissioner, that appellant is barred from challenging that year's CAUV Table before the BTA.

Proposition of Law No. [3]: Pursuant to R.C. 5717.02 and R.C. 5717.04, only an individual taxpayer may file an individual appeal to the BTA, and as such, the BTA lacks jurisdiction to entertain appellants' collective, multi-taxpayer appeal.

## II. ANALYSIS

**{¶ 23}** We review BTA decisions "to determine whether they are reasonable and lawful." *Grace Cathedral, Inc. v. Testa*, 2015-Ohio-2067, ¶ 16, citing R.C. 5717.04. Because the tax commissioner's cross-appeal presents threshold questions, we address it first.

### A. The tax commissioner's cross-appeal

**{¶ 24}** The tax commissioner's cross-appeal advances three propositions of law. None persuade us.

### 1. Whether the tax commissioner waived some of the arguments in her cross-appeal

**{¶ 25}** At the outset, the landowners assert that the tax commissioner has waived the arguments in her cross-appeal for the 2018, 2019, and 2020 CAUV entries because she did not advance those arguments during the BTA's proceedings following the remand that this court ordered in *Adams v. Testa*, 2017-Ohio-8853, at ¶ 42. In support, the landowners cite *Bd. of Edn. of South-Western City Schools v. Kinney*, 24 Ohio St.3d 184, 185 (1986), in which we observed that "[a]s a general rule, this court will not consider matters which were not presented to the Board of Tax Appeals."

**{¶ 26}** The tax commissioner counters with two arguments. First, the tax commissioner contends that the arguments she raises on cross-appeal were preserved below for the 2018, 2019, and 2020 CAUV entries by a motion to dismiss that she filed in the 2015 CAUV table case. Since the 2018, 2019, and 2020 CAUV table cases were consolidated with the 2015 case, the tax commissioner maintains that the motion to dismiss in the 2015 case applies with equal force to the consolidated cases. Second, the tax commissioner contends that regardless of whether her arguments for dismissal were preserved for the 2018, 2019, and 2020 cases, a question concerning a tribunal's subject-matter jurisdiction can be raised at any time. *See H.R. Options, Inc. v. Zaino*, 2004-Ohio-1, ¶ 8 ("we will treat the

Tax Commissioner's contention as preserved because a party cannot waive subject-matter jurisdiction, regardless of procedural deficiencies"). Under this rule, if the tax commissioner's three arguments in her cross-appeal are jurisdictional in character, then she may raise them now. This is where we begin our analysis.

{¶ 27} The tax commissioner's first proposition of law on cross-appeal implicates a question of standing and therefore may be understood to be jurisdictional in character. As this court has stated, "'[s]tanding is jurisdictional in administrative appeals "where parties must meet strict standing requirements in order to satisfy the threshold requirement for the administrative tribunal"'—both the tax commissioner and the BTA—'"to obtain jurisdiction."'" (Brackets added in *Cincinnati City School Dist. Bd. of Edn.*) *Cincinnati City School Dist. Bd. of Edn. v. Testa*, 2014-Ohio-4647, ¶ 18, quoting *Victoria Plaza Ltd. Liab. Co. v. Cuyahoga Cty. Bd. of Revision*, 1999-Ohio-148, quoting *State ex rel. Tubbs Jones v. Suster*, 1998-Ohio-275, ¶ 19, fn. 4; *see also Abraitis v. Testa*, 2013-Ohio-4725, ¶ 22 ("this court's jurisdiction over a tax case derives from the jurisdiction of the tax authorities from which the appeal has been taken"). The landowners' waiver argument against this proposition therefore fails.

{¶ 28} The tax commissioner's second proposition of law on cross-appeal points to a line of decisions that, she argues, require a litigant to raise a challenge to an administrative decision at the first available opportunity. That opportunity, the tax commissioner says, presented itself at the tax commissioner's public hearing prescribed by Adm.Code 5703-25-31. But, as will be explained, the tax commissioner has misread that line of decisions. The tax commissioner's argument based on Adm.Code 5703-25-31 cannot create jurisdictional consequences, because statutes, not administrative rules, delimit an agency's jurisdiction. *See State ex rel. Ohio Civ. Serv. Emps. Assn. v. State*, 2016-Ohio-478, ¶ 53 (noting the "general rule that agencies created by statute have such jurisdiction as the General Assembly confers"). Accordingly, it follows that the tax commissioner may have

waived her argument under her third proposition of law regarding the 2018, 2019, and 2020 CAUV entries. Nevertheless, we will not reach the question of whether the tax commissioner's motion to dismiss filed in the 2015 CAUV case preserved her arguments for the 2018, 2019, and 2020 cases, because, as explained below, we find no merit to the tax commissioner's argument on cross-appeal that the landowners were required to raise their challenges to the CAUV tables during the public-comment process to preserve their right to further challenge the tax commissioner's CAUV decisions.

{¶ 29} The tax commissioner's third proposition of law on cross-appeal asserts that R.C. 5717.02(A) authorizes appeals to the BTA by a single taxpayer—not, as here, multiple taxpayers. The tax commissioner's third proposition of law further asserts that multiple landowners cannot appeal, because R.C. 5717.04 authorizes appeals from BTA decisions to the court of appeals for the county in which the property is located and allowing multiple landowners to appeal would result in appeals potentially being brought in multiple courts of appeals. Both arguments are jurisdictional in character. As explained in *Adams*, R.C. 5717.02(A) speaks to the BTA's jurisdiction in terms of "what may be appealed . . . and who may bring the appeal." *Adams*, 2017-Ohio-8853, at ¶ 17. Because an element of the BTA's jurisdiction under R.C. 5717.02(A) depends on an appeal brought by a taxpayer, the tax commissioner's argument is jurisdictional in character. Similarly, the tax commissioner's argument under R.C. 5717.04 is jurisdictional in character because it concerns who may bring an appeal—that is, whether an appeal can be brought by only a single taxpayer or whether the right to appeal extends to multiple taxpayers at the same time. The landowners' waiver argument opposing this proposition therefore fails.

## 2. Whether the BTA lacked jurisdiction over taxpayers who appealed the issuance of CAUV entries that addressed counties where the taxpayers did not own property

{¶ 30} We now turn to the merits raised in the tax commissioner's cross-appeal. When the tax commissioner issues a CAUV entry, she attaches to it a table of values that Ohio's county auditors use to appraise CAUV property in their respective counties. Adm.Code 5703-25-31(D); Adm.Code 5703-25-33(A). Each entry applies to the counties performing a triennial or sexennial appraisal, Adm.Code 5703-25-31(D)—generally one-third of the counties in Ohio. Thus, the 2015 entry applied to about one-third of the counties (to simplify, we'll call them "A counties"), the 2016 entry applied to about another third ("B counties"), and the 2017 entry applied to the remainder ("C counties"). The cycle of issuing CAUV entries began again in 2018 with the tax commissioner's issuing an entry applicable to A counties, and so on for 2019 and 2020.

{¶ 31} The tax commissioner argues that if a landowner in one of the A counties were to appeal an entry issued in, say, 2016, then the BTA would lack jurisdiction over that landowner's appeal because the entry would apply only to the landowners in B counties. Ultimately, the tax commissioner's argument is inconsequential for the purpose of this case.

{¶ 32} In *Adams v. Testa*, the precursor to the present appeal, this court held that the landowners who had appealed the 2015 CAUV entry had standing to challenge the entry because "all of [them] own[ed] land subject to the" entry and thus were "taxpayers" within the meaning of R.C. 5717.02(A). 2017-Ohio-8853 at ¶ 33. In other words, under our holding in *Adams*, all of the landowners owned land in—borrowing the nomenclature from above—the A counties.

{¶ 33} The tax commissioner claims, however, that this case is different from *Adams* because this case extends through 2020. To support her argument, the tax commissioner points to the Fishers, plaintiff-appellant landowners, who have

appealed the CAUV entries issued in 2015, 2016, and 2017. According to the tax commissioner, the Fishers own land in Sandusky County, one of the counties enumerated in the 2015 CAUV entry. Thus, the argument goes, the Fishers had standing to challenge only the 2015 entry, not the entries for 2016 and 2017. The tax commissioner claims that the Fishers are not "taxpayer[s]" under R.C. 5717.02 for purposes of the 2016 and 2017 entries and therefore are not eligible to appeal the entries for those years.

{¶ 34} Our decision in *Cincinnati Golf Mgt., Inc. v. Testa*, 2012-Ohio-2846, obviates the need to decide the question the tax commissioner poses, which would entail evaluating the standing of each landowner to bring this appeal. In *Cincinnati Golf Mgt.*, the tax commissioner sought to have the City of Cincinnati dismissed for lack of standing. But this court refused to grant dismissal, finding that the argument was moot. I*d.* at ¶ 15. This court held that because a private entity whose interests were adverse to the tax commissioner was involved as a party in the case, there was "no jurisdictional necessity to determine the city's standing." *Id.* at ¶ 13, citing *Miller v. Blackwell*, 348 F.Supp.2d 916, 920 (S.D.Ohio 2004) ("If the Court determines that any one of the Plaintiffs has standing, the Court has jurisdiction and may proceed with the case.").

{¶ 35} Here, there is no dispute that the Fishers have standing to challenge the 2015 CAUV entry. So, in addition to what this court already said in *Adams*, 2017-Ohio-8853, at ¶ 33 (concluding that the landowners in that appeal had standing to challenge the 2015 entry), this court's jurisdiction over the appeal concerning the 2015 entry is complete, irrespective of the standing of other landowners in this appeal.

{¶ 36} Turning to the landowners' challenges to the 2016 and 2017 CAUV entries, even assuming that the Fishers lack standing to challenge them, there is still jurisdiction over such a challenge if another plaintiff-appellant landowner has standing to bring that challenge. To help answer that question, the tax

commissioner cross-references a table that she had furnished to the BTA, which, she says, explained to the BTA "which appellants had standing to challenge a given year's CAUV Table—and, in turn, which ones should be jurisdictionally barred from challenging a given year's CAUV Table." The table that the tax commissioner furnished to the BTA contains 31 entries, applicable to 31 discrete landowners, that purported to tell the BTA which landowners should be dismissed from the appeals challenging the 2015, 2016, and 2017 CAUV entries. The table does not help the tax commissioner's argument.

{¶ 37} The table's second row, for example, refers to a landowner who appealed the 2015 and 2016 CAUV entries. The tax commissioner urged the BTA to dismiss that landowner from the appeal challenging the 2015 entry, but not the 2016 entry. Thus, the tax commissioner does not dispute that that landowner has standing to challenge the 2016 entry. By the tax commissioner's own table, that landowner has standing to challenge the 2016 entry.

{¶ 38} Meanwhile, the fourth row refers to a landowner who appealed the 2015, 2016, and 2017 CAUV entries. The tax commissioner urged the BTA to dismiss that landowner from the appeal challenging the 2015 and 2016 entries, but not the 2017 entry. Thus, the tax commissioner does not dispute that that landowner has standing to challenge the 2017 entry. Again, by the tax commissioner's own table, that landowner has standing to challenge the 2017 entry.

{¶ 39} To recap, the tax commissioner concedes that the Fishers have standing to challenge the 2015 entry. And according to her own table, at least one landowner has standing to challenge the 2016 and 2017 entries, respectively. Because the tax commissioner does not advance an argument concerning the standing of any landowners to challenge the 2018, 2019, or 2020 entries, her standing argument necessarily fails in its entirety for every entry at issue in this appeal. Therefore, we have jurisdiction over this appeal. *See Cincinnati Golf Mgt.*, 2012-Ohio-2846, at ¶ 13-15.

**3. Whether each appellant must have raised a challenge to each year's CAUV entry at the tax commissioner's public hearing**

{¶ 40} Adm.Code 5703-25-31(D) states:

> [A] public hearing shall be held on the proposed [CAUV] entry after reasonable public notice has been given by the commissioner at least thirty days prior to the date set for the hearing in such manner and form as the commissioner determines. After the hearing the commissioner shall adopt the entry for the ensuing tax year for use in said counties for the next ensuing three tax years.

In her third proposition of law, the tax commissioner argues that if a landowner failed to advance a challenge to a proposed CAUV entry at the public hearing, then that landowner "is barred from challenging that year's CAUV [entry] before the BTA." According to the tax commissioner, most of the landowners failed to appear at the public hearing or failed to raise their issues to her directly. The tax commissioner thus seeks to bar the claims of every landowner in this appeal, except for the two who submitted written comments or objections in 2015 and 2016 regarding the rate that had been set for woodland clearing.

{¶ 41} Notably, Wilson, an executive administrator in the Tax Equalization Division of the department, testified that the public hearings are available so that the public can provide thoughts and comments on the tax commissioner's proposed entries. Wilson's testimony makes clear that these public hearings are not adversarial in nature; the hearings do not support an atmosphere where a formal complaint or legal challenge could be raised. Indeed, Wilson testified that not every issue raised by a person or entity at the public hearing is considered by the tax commissioner. Instead, Wilson testified, all comments made at the public hearings

get recorded and then are ranked according to their perceived importance—i.e., whether they raise a novel or significant issue or concern.

{¶ 42} The tax commissioner does not cite a rule or a statute that requires the result she urges here—that a landowner waives a challenge to a CAUV entry unless the landowner first challenges the entry at a public hearing. While the tax commissioner does cite caselaw in support of her position, we are not persuaded that the caselaw she cites is relevant in this context. The tax commissioner cites over 20 decisions to support her argument, but none arose within the context of, as here, a nonadversarial, public hearing held by an agency that failed to culminate in the adjudication by that agency of a particular party's rights. Therefore, rather than address each cited decision, we analyze the three she cites that involved her predecessors in office.

{¶ 43} The tax commissioner begins by couching her argument in terms of waiver, citing *Kinney*, 24 Ohio St.3d 184 (1986). But the posture of that case, unlike here, involved the filing of a formal complaint with the tax commissioner by a local board of education that challenged the tax-exempt status of discrete parcels of municipal property. The complaint was first heard by one of the tax commissioner's attorney examiners and decided by the tax commissioner, whose denial of the complaint was then appealed to the BTA. The BTA affirmed the tax commissioner's denial. This court determined on appeal that because the board of education had not raised its challenges to the constitutionality of the application of a tax statute during the tax commissioner's proceedings, the argument was waived for the purpose of appeal. *Id.* at 186 (observing that a taxpayer must raise a "challenge at the first available opportunity during the proceedings before the Tax Commissioner, and a failure to do so constitutes a waiver of that issue"). The posture here is markedly different because the tax commissioner did not determine a particular party's rights in an adversarial proceeding.

**{¶ 44}** The tax commissioner fares no better in trying to cast her argument in jurisdictional terms based on *CNG Dev. Co. v. Limbach*, 63 Ohio St.3d 28 (1992), and *DeWeese v. Zaino*, 2003-Ohio-6502. In both of those cases, unlike here, the tax commissioner had taken a specific action (issuance of an assessment) against a particular taxpayer that placed the taxpayer's liability at issue. Each case also featured a statute that authorized the taxpayer to advance objections to the tax commissioner by way of a petition for reassessment. *CNG* at 31, citing R.C. 5739.13; *DeWeese* at ¶ 10, citing R.C. 5711.31. In each case, this court held that the BTA could not exercise jurisdiction over issues that were not raised during the tax commissioner's proceedings. *CNG* at 32; *DeWeese* at ¶ 20. Again, the posture here is markedly different. Accordingly, we reject the tax commissioner's third proposition of law.

### 4. Whether R.C. 5717.02 and 5717.04 forbid multi-taxpayer appeals

**{¶ 45}** In her final proposition of law, the tax commissioner argues that "only an individual taxpayer may file an individual appeal to the BTA, and as such, the BTA lacks jurisdiction to entertain appellants' collective, multi-taxpayer appeal." The tax commissioner relies on R.C. 5717.02(A), which provides that an appeal from a final determination by the tax commissioner "may be taken to the board of tax appeals by the *taxpayer*." (Emphasis added.) She also relies on R.C. 5717.04, which provides that a "proceeding to obtain a reversal, vacation, or modification of a decision of the [BTA] determining" an appeal from a final determination "shall be by appeal to the supreme court or to the court of appeals for the county in which the property taxed is situated or in which the *taxpayer* resides." (Emphasis added.) The tax commissioner emphasizes the singular form of "taxpayer" used in both statutes, arguing that the word should be understood to exclude the plural form. The tax commissioner argues that because both statutes are written in the singular form, a multi-taxpayer appeal, such as the one at issue

here, must be dismissed as jurisdictionally defective. We are not persuaded by this argument.

{¶ 46} Ohio law provides that the "singular includes the plural, and the plural includes the singular." R.C. 1.43(A). And we have warned against "making fine distinctions about the meaning of a statute based upon its use of the singular form of a word." *State v. D.B.*, 2017-Ohio-6952, ¶ 16; *see also State v. Nettles*, 2020-Ohio-768, ¶ 14 (finding "little difficulty" in concluding that a statute's use of the word "county" included the plural form based on R.C. 1.43(A)). Applying these authorities, we conclude that the word "taxpayer" as used in R.C. 5717.02 and 5717.04 encompasses its plural form.

{¶ 47} The tax commissioner fears that if this court adopts the plural form, then it will create an impossibility under R.C. 5717.04. R.C. 5717.04 authorizes an appeal to the court of appeals in which the property is located or the taxpayer resides. Because this case involves property located in multiple counties, the tax commissioner hypothesizes that appeals could have been brought in multiple courts of appeals. The tax commissioner's argument invites an advisory opinion from this court because the hypothetical is not present in this case—that is, this case consists of one appeal involving multiple taxpayers brought in one judicial forum. This court's "long-standing practice disfavors issuing advisory opinions." *Capital Care Network of Toledo v. Ohio Dept. of Health*, 2018-Ohio-440, ¶ 31. Accordingly, we reject the tax commissioner's final proposition of law.

### B. The landowners' appeal

### 1. Whether the BTA erred in upholding the tax commissioner's selection of the $1,000 clearing-cost rate

{¶ 48} In their first proposition of law, the landowners argue that the tax commissioner abused her discretion in selecting the $1,000 clearing-cost rate for the CAUV entries. In affirming these entries, the landowners claim that the BTA acted unreasonably and unlawfully.

{¶ 49} In *Adams*, 2017-Ohio-8853, at ¶ 28, we observed, generally and without deciding the issue, that the tax commissioner enjoyed "discretionary authority" in adopting her 2015 CAUV entry. "[W]hen the BTA reviews a determination of the tax commissioner that involves the commissioner's exercise of a discretionary power conferred by statute, the BTA must apply the abuse-of-discretion standard." *Johnson*, 2021-Ohio-1664, at ¶ 19 (considering a farmer's challenge to the BTA's affirmance of the tax commissioner's adoption of a figure in a CAUV entry relating to soil drainage). Because the exercise of the tax commissioner's discretion is at issue, this court too must apply an abuse-of-discretion standard. *See J.M. Smucker, L.L.C. v. Levin*, 2007-Ohio-2073, ¶ 16 (observing that "the BTA and the court must apply an abuse-of-discretion standard when reviewing" a discretionary act of the tax commissioner). In conducting our review, we must determine whether the landowners have shown that the tax commissioner's actions are unreasonable, arbitrary, or unconscionable. *Id.*

### a. The tax commissioner acted unreasonably and arbitrarily

{¶ 50} The landowners claim that the tax commissioner's adoption of the $1,000 clearing-cost rate for woodlands was unreasonable and arbitrary. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Ents., Inc. v. River Place Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is "'without [an] adequate determining principle; . . . not governed by any fixed rules or standard.'" (Ellipsis added in *Scandrick*.) *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), quoting *Black's Law Dictionary* (5th Ed. 1979).

{¶ 51} In this case, the BTA determined that the tax commissioner stayed within the bounds of her discretion in "[a]dopting the Advisory Committee's recommended $1,000 clearing cost deduction," BTA Nos. 2015-1090, 2016-1061, 2017-1867, 2018-1143, 2019-1632, 2020-1347, 2023 WL 3433584, at *7, and the tax commissioner defends the BTA's determination on appeal. The one piece of

evidence that bears most directly on the BTA's determination is the CAUV table from May 2015 that summarized the changes for tax year 2015. It contains a statement that the tax commissioner's decision to increase the rate from $500 to $1,000 was "based on input from [the] advisory committee." But it is hard to determine the accuracy of that statement in light of the evidence presented in this case. Gardner could not recall any member of the advisory committee who had recommended a clearing-cost rate of $1,000 per acre for woodlands. Nor could Wilson recall any person or organization who provided the department with reliable data showing a clearing-cost rate of $1,000 per acre.

{¶ 52} Another piece of evidence that touches on the $1,000 rate is an email from the Farm Bureau to Gardner, explaining that the bureau had received a clearing quote from a drainage contractor in the range of $800 to $1000. But as Wilson explained during her testimony before the BTA, that quote was not a reliable datum that could support a woodland-clearing-cost rate. And neither Gardner nor Wilson could otherwise point to any specific evidence or method to explain why the $1,000 rate was selected by the tax commissioner. According to Gardner, "just from the general discussions from the Advisory Committee and discussions within the Department, the Department believed that increasing the clearing costs from 500 to a thousand dollars per acre at that time was a reasonable adjustment to make." And Wilson testified that because the market data considered by the department was unreliable, the tax commissioner simply doubled the rate to $1,000 in recognition that the $500 rate was too low.

{¶ 53} We conclude under these facts that the tax commissioner abused her discretion in selecting the $1,000 clearing-cost rate for woodlands. First, the $1,000 rate is arbitrary because it is "'not governed by any fixed rules or standard,' " *Scandrick*, 67 Ohio St.2d at 359, quoting *Black's*. In *Scandrick*, this court considered whether a city had abused its discretion in selecting one bidder over another to construct a recreation center. The city explained that its selection process

had preferred local bidders even if their bids were not the lowest but added the caveat that if a nonlocal bidder submitted a bid that was "many percentages" below a local bidder, then the city might select that nonlocal bidder. *Id.* at 360. We found that the many-percentages standard was arbitrary because it contained "absolutely no guidelines or established standards for deciding by how 'many percentages' a bid may exceed the lowest bid and yet still qualify as the 'lowest and best' bid." *Id*. We stated that "[a]bsent such standards, the bidding process becomes an uncharted desert, without landmarks or guideposts" to guide an official's exercise of discretion. *Id.*

{¶ 54} Here, nothing in the CAUV-related regulations or statutes authorizes the tax commissioner to apply a doubling method to the previous rate, and the parties have not pointed to reliable evidence from which the $1,000 clearing-cost rate could have been derived. Instead, as Gardner and Wilson attested, the tax commissioner effectively made an instinctive decision based on the department's view that the $500 per acre clearing-cost rate was too low. The tax commissioner's decision to increase the rate is warranted in light of the department's view that the existing rate was too low. But the problem is that simply doubling the rate does not necessarily result in a reasonable endpoint. By the tax commissioner's logic, if she has discretion to double the rate with no concrete basis or reason to do so, then she seemingly has discretion to triple or quadruple the rate. Indeed, under her argument, the use of any other multiplier to set a new rate would seemingly fall within her discretion. The tax commissioner's method is bereft of standards by which to test the exercise of discretion, and therein lies the problem.

{¶ 55} Second, for the same reasons provided above, the decision to set a $1,000 clearing-cost rate for woodlands is unreasonable because it is not supported by a "sound reasoning process," *AAAA Ents.*, 50 Ohio St.3d at 161. The doubling method used to calculate the rate is not supported by any recognized authority, whether it be statistical, legal, agricultural, or otherwise. And because the method

has no foothold in sound reasoning, it could just as easily have been discarded in favor of a different method that relies on a different multiplier. Thus, we find that the tax commissioner's decision was unreasonable.

**{¶ 56}** Because we conclude that the tax commissioner abused her discretion in adopting the $1,000 rate for the 2015 CAUV entry, we similarly conclude that she did so for the 2016, 2017, 2018, 2019, and 2020 CAUV entries because those entries carried the 2015 rate forward without adjustment.

### *b. The tax commissioner's counterarguments are unpersuasive*

**{¶ 57}** The tax commissioner advances several counterarguments to rebut the landowners' claim that she acted unreasonably and arbitrarily. None convince us.

**{¶ 58}** First, the tax commissioner argues that because the landowners have challenged the CAUV entries "in their entirety," the landowners must show that the clearing-cost rate combined with all the other variables that go into a CAUV entry (e.g., soil type, capitalization rate, cost of farming equipment) could never produce an accurate CAUV in an Ohio county. To begin, the tax commissioner's premise is wrong. The landowners challenge only a narrow aspect of the CAUV entries: they request that the court find that the clearing-cost rate was adopted in error and direct the tax commissioner to reissue the CAUV entries with a revised rate.

**{¶ 59}** But even if the tax commissioner's premise were correct—i.e., that the landowners challenge the CAUV entries in their entirety—the legal authority she relies on to advance her point is inapt because it is based in constitutional law, which does not apply here. The landowners are not raising a facial challenge to the constitutionality of a statute such that they would be required to prove that there is no set of circumstances in which the CAUV entry could be upheld. *See, e.g.*, *Arbino v. Johnson & Johnson*, 2007-Ohio-6948, ¶ 26 (to prevail on a facial challenge, a challenger "must demonstrate that there is no set of circumstances in which [the] statute would be valid").

{¶ 60} Second, the tax commissioner makes an economic argument. She says that increasing the clearing-cost rate above $1,000 would result in a minimum impact on the landowners. But she cites no authority that requires a taxpayer to show that the relief sought would exceed a minimum impact. She also points to one landowner who testified at the BTA hearing that he had no concrete plans to clear the woodlands from his property. She reasons that it is untenable for that landowner to seek relief here because the clearing-cost deduction already creates a windfall for him since he will get the benefit of the deduction without actually paying to have the woodland cleared. The tax commissioner has made this argument, however, while conceding elsewhere in her brief that a landowner may take the deduction whether or not "a particular parcel had actually cleared woodland that particular year (or even attempted to do so)." Thus, the purported windfall referred to by the tax commissioner is one that she agrees is permitted by the entry she drafted. If that is a problem from a tax-policy perspective, we see no reason why she could not address it in a future CAUV entry. But it is not an issue for us to resolve.

{¶ 61} Third, the tax commissioner says that if the landowners were to prevail, then one set of CAUV entries will apply to them and another set will apply to everyone else. We do not agree. The tax commissioner points to nothing in the CAUV-related statutes or regulations that contemplates that she may issue a taxpayer-specific CAUV entry; rather, the CAUV entries apply across the board to all qualifying taxpayers. Additionally, even if it would be difficult for the tax commissioner to reissue a CAUV entry with a revised clearing-cost rate, the tax commissioner cites no authority for the proposition that this court may withhold relief to a deserving taxpayer based on a tax commissioner's fear that the relief will be challenging to implement.

{¶ 62} Fourth, the tax commissioner claims that in order for this court to grant relief, we must determine whether the landowners have suffered an injury.

The tax commissioner cites *Moskowitz v. Cuyahoga Cty. Bd. of Revision*, 2017-Ohio-4002, ¶ 11, in which we held that "[i]n tax proceedings, a party may appeal a decision only to the extent that the decision aggrieves that party." The tax commissioner provides no meaningful analysis to support this argument, which is grounds alone to reject it. *See, e.g.*, *Mason City School Dist. Bd. of Edn. v. Warren Cty. Bd. of Revision*, 2014-Ohio-104, ¶ 38 (rejecting an undeveloped legal argument). But even if the tax commissioner had provided an analysis in support, the landowners have pointed to evidence that, on its face, shows that the clearing costs for woodlands are in excess of $1,000 per acre. And the evidence shows that a lower clearing-cost rate will generally result in a higher tax bill for CAUV purposes. Thus, the landowners have shown an adequate injury.

{¶ 63} Fifth, the tax commissioner argues that in order for the landowners to obtain relief, the BTA would be required to rewrite the CAUV entries, which it is not authorized to do. She correctly observes that the BTA is a creature of statute and can only exercise such powers as are conferred by statute. *See Cleveland Gear Co. v. Limbach*, 35 Ohio St.3d 229, 231 (1988) ("the Board of Tax Appeals is an administrative agency, a creature of statute"). The tax commissioner thus argues that because R.C. 5713.03 does not expressly authorize the BTA to revise a numerical figure in a CAUV entry, the BTA cannot provide the relief sought by the landowners. This is a straw-man argument. In this case, the landowners have not asked this court to order the BTA to issue revised CAUV entries; the landowners have asked us to order the tax commissioner to issue revised CAUV entries.

{¶ 64} Sixth, the tax commissioner says that because the "logical endgame" of the landowners' appeal is to receive a refund of overpaid real-property taxes, the landowners should have instead brought individual complaints before their respective county boards of revision under R.C. 5715.19. The tax commissioner has again erected a straw man—the landowners have not asked for a refund in this appeal.

**{¶ 65}** Last, the tax commissioner raises a policy argument that warns against granting relief to the landowners because she foresees requests from the landowners for property-tax refunds that might financially harm the counties in which the landowners own their respective properties. It is not the function of this court to resolve policy arguments. *See Willacy v. Cleveland Bd. of Income Tax Review*, 2020-Ohio-314, ¶ 33.

**{¶ 66}** In sum, we find the tax commissioner's counterarguments meritless.

## 2. Whether the tax commissioner ran afoul of Adm.Code 5703-25-33 in calculating the clearing-cost rate

**{¶ 67}** The landowners' second proposition of law is largely a response to the view expressed by department personnel at the BTA's hearing that bemoaned the lack of reliable data to calculate a clearing-cost rate for woodlands. According to the landowners, the CAUV regulations do not permit the tax commissioner to pick a clearing-cost rate "out of thin air" but, rather, impose an affirmative obligation on her to locate evidence that will generate a reliable clearing-cost rate notwithstanding the perceived inadequacy of third-party-supplied evidence. The landowners are correct.

**{¶ 68}** Relevant here is a CAUV rule requiring the tax commissioner to "calculat[e] and prepar[e]" her CAUV table in accordance with Adm.Code 5703-25-33. Adm.Code 5703-25-33(A). The landowners point to divisions (B), (D) and (J) of the rule, which provide:

- "The use of the income approach to develop annual 'Current Agricultural Use Value of Land Table Or Tables' that are accurate, reliable and practical requires that careful attention be given to the many principles and techniques involved." Adm.Code 5703-25-33(B);

- "Information shall be obtained from such agencies as cooperative extension service, college of agriculture, the Ohio state university; Ohio agricultural research and development center; national resources conservation services,

U.S.D.A.; forest service, U.S.D.A.; national agricultural statistical service, U.S.D.A.; department of agriculture of Ohio; department of natural resources of Ohio, federal land bank and other reliable sources." Adm.Code 5703-25-33(D);

- "Non land production costs: Information on typical non-land production costs shall be obtained from the best available sources." Adm.Code 5703-25-33(J).

{¶ 69} Reading those divisions together, the landowners argue that the fact that the tax commissioner received insufficient data from third parties to calculate a clearing-cost rate did not give her license to create a rate out of whole cloth. Rather, the landowners say, the tax commissioner has a mandatory duty under division (D) to obtain information from "reliable sources" and a mandatory duty under division (J) to obtain information from "the best available sources." Because the tax commissioner did not obtain such information, the landowners reason that the tax commissioner violated divisions (D) and (J). Further, the landowners claim that because the tax commissioner did not heed divisions (D) and (J), the tax commissioner violated division (B)'s requirement that she calculate and prepare a CAUV table that is accurate, reliable, and practical.

{¶ 70} Although the question here turns on the meaning of a rule rather than a statute, our statutory-interpretation principles apply with equal force. *See State ex rel. Fire Rock, Ltd. v. Dept. of Commerce*, 2021-Ohio-673, ¶ 13 (when a "case involves the interpretation of a rule rather than a statute, this court's statutory-interpretation principles apply just the same"). "The starting point for determining a rule's meaning is its text, *see Spencer v. Freight Handlers, Inc.*, 131 Ohio St.3d 316, 2012-Ohio-880, 964 N.E.2d 1030, ¶ 16, which must be understood in its context, according to the rules of grammar and common usage, *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21." *Fire*

*Rock* at ¶ 13. When a rule's meaning is unambiguous, a court must apply that meaning and may not amend the rule through the insertion or deletion of words. *Id.*

{¶ 71} Here, the use of "shall" in both divisions (D) and (J) is significant. "'In statutory construction, the word "may" shall be construed as permissive and the word "shall" shall be construed as mandatory unless there appears a clear and unequivocal legislative intent that they receive a construction other than their ordinary usage.' " *State ex rel. Gilreath v. Cuyahoga Job & Family Servs.*, 2024-Ohio-103, ¶ 43, quoting *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102 (1971), paragraph one of the syllabus; *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 114 (2012) ("when the word *shall* can reasonably be read as mandatory, it ought to be so read" [emphasis in original]). Because nothing in the text of the rule obviously suggests that the rule's use of the word "shall" should bear anything other than its ordinary meaning, it follows that the tax commissioner had a mandatory duty to obtain information as contemplated by divisions (D) and (J) in the course of adopting the CAUV tables at issue here.

{¶ 72} The tax commissioner generally accepts this reading, acknowledging that "[c]ertainly, [she] should—and does—endeavor to rely upon the most reliable data available." And she further acknowledges that it would be improper for her to ignore reliable evidence. But she says that she did not ignore reliable information; rather, she says that the information that was provided to her was unreliable. Thus, she reasons that she should not be penalized for not relying on the data that was given to her. Quoting the BTA's decision for the proposition that " '[i]n an ideal world, the Commissioner could have compiled data from sources throughout the state to verify an average [clearing] rate,' " BTA Nos. 2015-1090, 2016-1061, 2017-1867, 2018-1143, 2019-1632, 2020-1347, 2023 WL 3433584, at *7, the tax commissioner urges us to recognize that "[t]his is the real world, of course. And part of that real world is that, in the absence of information that the Department determines to be insufficiently reliable, . . . the Department still must

31

proceed with developing a CAUV Table for each year." The tax commissioner's argument fails on two levels.

**{¶ 73}** First, the evidence does not establish that it was impossible for the department to obtain reliable information. The most specific piece of evidence on this point is Wilson's testimony. When asked whether the department had considered conducting studies or research, or engaging someone else to do it, Wilson testified that for 2015, the department had "initiate[d] some telephone calls . . . to companies that [it] identified as potentially being able to provide [it] with this information. But people [weren't] always really happy to say how much they charge for their services when [receiving a] call from the tax department." At best, Wilson's testimony suggests that finding reliable data is difficult but not impossible. Moreover, after 2015, Wilson testified that the department made no phone calls and made no requests for information from land-clearing companies to attempt to find reliable data. And Wilson further testified that the department has never conducted written surveys or sent out questionnaires. Nor has it been shown that the department lacks the resources to obtain sufficiently reliable information.

**{¶ 74}** Second, Adm.Code 5703-25-33(B) contemplates that the tax commissioner will issue a CAUV table that is "accurate, reliable and practical." By the tax commissioner's logic, this standard need not be met when, as here, the department deems the information given to it by the advisory committee unreliable or faces difficulties in obtaining such information. Yet, there is no exception in the rule that would allow the tax commissioner to depart from the standard under the circumstances presented here. And this court can no more create an exception to an administrative rule than it can a statute. *See Pauley v. Circleville*, 2013-Ohio-4541, ¶ 38 ("The General Assembly understands how to draft laws that contain exceptions, but included no exception that can be applied in this case. And we will not create an exception by judicial fiat.").

{¶ 75} In sum, we conclude that the tax commissioner did not follow Adm.Code 5703-25-33 in adopting the clearing-cost rate.

### III. CONCLUSION

{¶ 76} We reverse the BTA's decision and remand the cause to the tax commissioner with instructions that she adopt a clearing-cost rate that complies with the standards prescribed in Adm.Code 5703-25-33. The tax commissioner may evaluate additional evidence outside of the existing record in selecting a rate.

Decision reversed

and cause remanded.

—————————

Van Kley Law, L.L.C., and Jack A. Van Kley, for appellants and cross-appellees.

Dave Yost, Attorney General, and Daniel G. Kim, Assistant Attorney General, for appellee and cross-appellant.

Chad A. Endsley, Leah F. Curtis, and Leah Hetrick, urging reversal for amicus curiae, Ohio Farm Bureau Federation.

—————————