[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Claugus Family Farm, L.P. v. Harris*, **Slip Opinion No. 2025-Ohio-2807.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-2807

CLAUGUS FAMILY FARM, L.P., APPELLANT, *v*. HARRIS, TAX COMMR., APPELLEE.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Claugus Family Farm, L.P. v. Harris*, Slip Opinion No. 2025-Ohio-2807.]**

*Taxation—Use-tax exemption—R.C. 5739.01(F)—R.C. 5739.02(B)(42)(n)—R.C. 5741.02(C)(2)—Adm.Code 5703-9-23(A)(1)—Timber farm entitled to use-tax exemption on its purchase of Mercedes-Benz Geländewagen because (1) timber farm was actively engaged in business of farming at time of vehicle's purchase, (2) vehicle was used for farming, as it allowed for traversing forest's rugged terrain to apply instruments of remediation to forest floor to facilitate growth of timber, and (3) vehicle was primarily used for farming—Board of Tax Appeals' decision reversed and cause remanded.*

(No. 2024-0895—Submitted May 13, 2025—Decided August 13, 2025.)

APPEAL from the Board of Tax Appeals, No. 2020-740.

———————————

SHANAHAN, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, BRUNNER, DETERS, and HAWKINS, JJ., joined.

**SHANAHAN, J.**

{¶ 1} Claugus Family Farm, L.P. ("CFF"), claims that a vehicle it purchased is exempt from taxation because the vehicle is used in CFF's farming operations. The Tax Commissioner, Patricia Harris, disagreed and issued CFF an assessment for unpaid use tax. The Board of Tax Appeals affirmed the tax commissioner's determination, and CFF appealed.

{¶ 2} Because we conclude that the vehicle at issue meets the requirements for the use-tax exemption, we reverse the board's decision and remand the cause to the board for cancellation of the assessment.

## I. BACKGROUND

{¶ 3} CFF has been in business since 1902, first operating as a fruit and dairy farm, later as only a dairy farm, and now as a timber farm. The farm is located on rugged terrain in Monroe County and consists of about 1,100 acres—900 of which are populated with timber.

{¶ 4} In 2018, CFF paid $111,997 for a 2015 Mercedes-Benz Geländewagen. CFF did not pay tax on the vehicle at the time of purchase, claiming that the vehicle was not subject to taxation, because it would be used directly in farming. The tax commissioner disagreed and issued a $9,461.58 use-tax assessment composed of the unpaid tax, preassessment interest, and a penalty.

{¶ 5} In her final determination supporting the assessment, the tax commissioner relied on R.C. 5739.02(B)(42)(n), which provides that no sales tax is owed when "the purpose of the purchaser is to . . . use or consume the thing transferred primarily in producing tangible personal property for sale by farming, agriculture, horticulture or floriculture." Under R.C. 5741.02(C)(2), the sales-tax

exemption applies in the use-tax realm. *See Stingray Pressure Pumping, L.L.C. v. Harris*, 2023-Ohio-2598, ¶ 11 ("when an item is exempt from the sales tax, it is generally also exempt from the use tax").

{¶ 6} In the context of sales and use tax, the tax commissioner defines "farming" as "the occupation of tilling the soil to produce crops *as a business* and includes raising livestock, bees, or poultry, if the purpose is to sell such livestock, bees, or poultry, or the products thereof as a business." (Emphasis added.) Adm.Code 5703-9-23(A)(1). In the same context under Ohio tax law, "'[b]usiness' includes any activity engaged in by any person with the object of gain, benefit, or advantage, either direct or indirect." R.C. 5739.01(F).

{¶ 7} Based on the authorities cited above, the tax commissioner reasoned that CFF had to pass a three-part test for its Mercedes to qualify for the use-tax exemption: First, CFF had to be engaged in the business of farming. Second, the vehicle had to be used directly in farming activities, such as growing crops. And third, farming activities had to account for the vehicle's primary use. The tax commissioner determined that CFF failed all three parts of the test. First, the tax commissioner observed that despite the presence of marketable timber on its property, CFF had not sold timber or reported any income since 2011. The tax commissioner determined that while CFF had provided evidence showing previous timber harvests and plans for future harvests, that evidence was "insufficient to demonstrate that [CFF] *is currently engaged in the business of farming.*" (Emphasis added.) Ohio Dept. of Taxation, Final Determination, Assessment No. 100001147473 Use Tax, at 2 (Mar. 27, 2020). Second, the tax commissioner determined that CFF had failed to provide evidence showing that the vehicle was used directly in farming activities; she concluded that the vehicle was used merely for "maintaining property which contains a forest." *Id.* at 5. Third, the tax commissioner concluded that whether the vehicle was used primarily in farming

could not be determined, because CFF did not quantify the vehicle's use in terms of a percentage. *Id.*

{¶ 8} CFF appealed to the board, presenting two witnesses at the board's evidentiary hearing. CFF first presented the testimony of Alex Kindler, a forest-management consultant (also known as a forester), who CFF hired in 2017. One of the services Kindler has provided CFF is the creation of a forest-management plan, which he described as a document that outlines the attributes of a forest, enumerates the landowner's objectives, and sets out an action plan to achieve those objectives.

{¶ 9} Kindler was not CFF's first forester. From 2001 to 2008, CFF retained Earl Murphy in that role. During Murphy's tenure, CFF produced almost 1.2 million board feet of timber and more than $490,000 in revenue. In Kindler's view, the timber-harvesting regimen put in place by Murphy was not sustainable in the long term, because it would have led to the forest being overrun by non-native, invasive species. In 2015, the farm retained Chad Hammond. Hammond's forest-management plan was, in Kindler's view, generally thorough and well-grounded in the science of forestry. But Kindler opined that Hammond did not fully appreciate the threat posed to the forest by non-native, invasive species and therefore did not account for it in his plan.

{¶ 10} Kindler testified that CFF's objective is to cultivate a healthy, sustainable, and valuable forest for timber harvesting. To achieve this objective, Kindler created a forest-management plan that emphasizes the removal of non-native, invasive species as a condition precedent to harvesting. As he explained, non-native, invasive species compete with the desirable native species (e.g., poplar, sugar maple, and oak). Without proper forest management, non-native, invasive species can block the growth of the native species that CFF could harvest and sell on the timber market. In Kindler's view, it would be irresponsible for CFF to commence harvesting its stock of timber without first addressing the problem posed

by the non-native, invasive species. If harvesting were to proceed apace, he said, the forest would eventually be overrun by the non-native, invasive species. Indeed, later testimony presented during the hearing indicated that a nearby timber farm had succumbed to that problem when all its marketable timber was aggressively harvested. Kindler explained that CFF has hired timber-stand-improvement vendors—third parties that traverse the property with chainsaws and herbicides to kill the undesirable species—in an effort to avoid the same fate.

{¶ 11} In his forest-management plan, Kindler also recommends that CFF practice selective cutting, a process in which a select portion of the timber stock would be cut at one time, leaving the immature stock untouched. With selective cutting, the expectation is that new timber stock would grow in the harvested area in 15 to 20 years. Wait times of this duration are common in the timber-farming industry. According to Kindler, selective cutting has been proven to generate the highest economic return that an owner can achieve from a forest. If the timber stock is managed properly, the owner should see an annual return of 10 percent.

{¶ 12} CFF next presented the testimony of Bruce Claugus, who has been CFF's managing general partner for over 20 years. He has been at the center of CFF's expansion and modernization, overseeing the investment of nearly $2 million in capital agricultural improvements, including the installation of roads to provide better access to the timber.

{¶ 13} Claugus testified that before he purchased the Mercedes, he purchased a Chevrolet Silverado and a Jeep Wrangler for use on the farm, but he found that neither was suitable for the work. He explained that the Wrangler could traverse the terrain but was small and lacked a sufficient payload and that the Silverado would spin out for lack of traction and generally did not handle off-road driving well. Claugus testified that the Mercedes is more ruggedly built than both the Wrangler and the Silverado, is capable of traversing the forest's terrain at up to a 45-degree angle and driving through two feet of water, has an adequate payload,

and offers adequate space for carrying equipment. Claugus described the Mercedes as roadworthy but unpleasant to ride in, explaining that it was originally designed for military use, is loud, gets poor gas mileage, and lacks adequate temperature control in the winter and summer.

{¶ 14} Claugus estimated that 95 percent of the Mercedes' use is for timber farming. In his view, the Mercedes optimizes CFF's use of time, effort, and money, enabling him and others to better travel through the forest to inspect for signs of disease, identify wind damage and lightning strikes, locate invasive species and mature stock, and carry chemicals and equipment (e.g., chainsaws, marking tools). Although the Mercedes is not big enough to move timber, Claugus stated that without it, the forest would have to be traversed by foot, which he regarded as impractical, as it takes eight days to walk the forest's central acreage.

{¶ 15} Claugus also explained that timber farming requires the use of bulldozers and skidders to remove timber from the forest floor for placement on a truck. Sometimes these machines break down in the forest, and the Mercedes can carry the tools needed to fix them.

{¶ 16} To illustrate the Mercedes' importance to CFF's farming operations, Claugus cited the problem posed by the emerald ash borer—a type of beetle. He testified that when the emerald ash borer began decimating his stock of ash trees, the farm had not yet built roads through the forest and did not have a vehicle that could readily traverse the terrain; as a result, his entire ash-tree population perished. He explained that if the farm had had the Mercedes at that time, he would have been able to salvage the timber stock because workers could have navigated the terrain in that vehicle and identified the invasion early.

{¶ 17} Claugus did not specifically say when CFF will commence harvesting timber, but he expects that it will be "soon."

{¶ 18} The board determined that CFF's purchase of the Mercedes was taxable, and it upheld the tax commissioner's final determination. BTA No. 2020-

740, 2024 Ohio Tax LEXIS 728, *7. It did not make a definitive ruling as to whether CFF is engaged in farming as a business under the first part of the test for determining whether the use-tax exemption for farming applies. *See id.* at *5. But with respect to the second part of the test, it determined that CFF does not use the Mercedes directly in farming activities but, rather, for transportation around the farm generally. *Id.* at *5-6. Citing its decision in *Topola v. Levin*, BTA No. 2011-K-4549, 2012 Ohio Tax LEXIS 5444 (Nov. 13, 2012), the board noted that "the use of vehicles for transportation around a farm, as well as general uses such as delivering parts and cutting and hauling of wood and brush, do not constitute direct farming activities." 2024 Ohio Tax LEXIS 728 at *6. And regarding the third part of the test, the board determined that the Mercedes is primarily used for transportation, not farming. *Id.* at *5-6. CFF appealed, advancing three propositions of law.

## II.  ANALYSIS

{¶ 19} Our function is to determine whether the board's decision was reasonable and lawful. *See* R.C. 5717.04; *Adams v. Harris*, 2024-Ohio-4640, ¶ 23. Both the tax commissioner and the board analyzed this case under a three-part test. CFF and the tax commissioner do the same here on appeal.

{¶ 20} The parties argue that under the second part of the test for determining whether the tax exemption applies, the vehicle at issue here must be used *directly* in farming. R.C. 5739.02(B)(42)(n), however, lacks the word "directly."[1] The statute previously used the word "directly" in connection with the farming exemption, *see* former R.C. 5739.02(B)(42)(a), Am.Sub.S.B. No. 181

---

1. CFF cites R.C. 5739.02(B)(17) alongside R.C. 5739.02(B)(42)(n) in support of its argument. The former exempts from sales tax "[s]ales to persons engaged in farming, agriculture, horticulture, or floriculture, of tangible personal property for use or consumption primarily in the production by farming, agriculture, horticulture, or floriculture of other tangible personal property for use or consumption primarily in the production of tangible personal property for sale by farming, agriculture, horticulture, or floriculture." CFF does not argue that R.C. 5739.02(B)(17) has a different meaning from R.C. 5739.02(B)(42)(n).

(effective Sept. 13, 2010),[2] but that word was later removed by the General Assembly in relation to the farming exemption, *see* former R.C. 5739.02(B)(42)(a) and (n), Am.Sub.H.B. No. 153 (effective Sept. 29, 2011). The parties' focus on whether the vehicle's use is *directly* related to farming thus appears to be a holdover from prior legislation.

{¶ 21} Because this court cannot create a statutory requirement that the General Assembly has not prescribed, we do not consider whether the vehicle is used *directly* in farming. *See Wheeling Steel Corp. v. Porterfield*, 24 Ohio St.2d 24, 27-28 (1970) ("Neither the Board of Tax Appeals, nor this court, may legislate to add a requirement to a statute enacted by the General Assembly.").

*A. CFF is engaged in the business of farming*

{¶ 22} Under its first proposition of law, CFF contends that it is in the business of timber farming and thus satisfies the first part of the test for the tax exemption. The tax commissioner does not dispute that timber harvesting can constitute farming. Indeed, she acknowledges in her merit brief that "R.C. 5739.02(B)(42)(n) and [Adm.Code] 5703-9-23 provide an exemption from the sales and use tax for items where the purpose of the purchaser is to use or consume the thing transferred primarily in the business of farming timber for sale." Rather, she argues that CFF fails the first part of the test because it is not engaged in farming as "*an active business enterprise*." (Emphasis added.) In her view, CFF does not engage in timber farming as a business, because its lack of sales, income, and labor expenses since 2011 demonstrate that CFF lacks a profit motivation.

{¶ 23} Although it is not obvious from the board's decision that the board definitively decided this issue, it at least implied in its decision that CFF failed the first part of the test. The board pointed to the tax commissioner's findings that CFF

---

2. Former R.C. 5739.02(B)(42)(a) provided a sales-tax exemption when the purchaser's purpose was "to use or consume the thing transferred *directly* in producing tangible personal property for sale by . . . farming." (Emphasis added.)

had not made any sales or reported any income on Schedule F (for reporting a profit or loss from farming) of its federal-income-tax returns since 2011, and it noted that beginning in 2012, CFF reported on its Schedule F's that it had not materially participated in the operation of the business. BTA No. 2020-740, 2020 Ohio Tax LEXIS, at *5. In the interest of caution, under its first proposition of law, CFF treats the board's order as though the board definitively determined that CFF is not engaged in timber farming as a business. CFF contends that it *is* so engaged. We agree with CFF.

{¶ 24} R.C. 5739.02(B)(42)(n) does not refer to farming explicitly as a "business." But a rule adopted by the tax commissioner under the authority granted to her by R.C. 5739.05(A)(1) defines "farming" as "the occupation of tilling the soil to produce crops *as a business* and includes raising livestock, bees, or poultry, if the purpose is to sell such livestock, bees, or poultry, or the products thereof as a business" (emphasis added), Adm.Code 5703-9-23(A)(1). The rule thus conveys that there is a business component to farming. In turn, R.C. 5739.01(F) defines "business" as "any activity engaged in by any person with the object of gain, benefit, or advantage, either direct or indirect."

{¶ 25} R.C. 5739.01(F) provides that to qualify as a business for purposes of the use-tax exemption, the taxpayer must show that it is engaging in the activity that it identifies as a "business" "with the object of gain, benefit, or advantage." *See Webster's Third New International Dictionary* (2002) (defining "object" as "something (as an end, aim, or motive) by which the mind or any of its activities is directed"). Thus, even if that aim falls short because the taxpayer fails to generate a profit despite its activities, the taxpayer can still be said to be in business. *See State ex rel. City Loan & Savings Co. of Wapakoneta v. Zellner*, 133 Ohio St. 263, 270 (1938) (interpreting predecessor to R.C. 5739.01(F) and observing that "[i]t is significant . . . that the statute defining the term 'business' does not use or include the word 'profit'").

{¶ 26} In this case, Claugus testified that CFF's objective with respect to timber farming is to "make as much money with as little effort as possible" by letting "the trees do the work." CFF recognizes that it was not literally engaged in the activity of cutting down timber for sale when it purchased the Mercedes. But it maintains that given the nature of timber farming, whereby a stand of trees takes decades to mature into harvestable timber, CFF should not be expected to show that it was actively engaged in the harvesting of its timber when it purchased the Mercedes to establish that it is engaged in the business of farming. Since 2011, CFF has followed a program of responsible stewardship by implementing a forest-management plan and focusing in the near term on removing non-native, invasive species from its forest so that in the long term it can harvest high-quality timber on a consistent and sustainable basis. We conclude that these activities show that CFF is engaged in farming as a business.

{¶ 27} CFF's lack of timber sales and income does not change the analysis. Although the existence of one or both of those things would generally bolster a taxpayer's claim that it is engaged in a business, neither is required under R.C. 5739.01(F).

{¶ 28} Nor is it probative that in completing the Schedule F's for its federal-income-tax filings since 2012, CFF checked the box marked "no" when responding to the question whether the taxpayer had "materially participate[d]" in the operation of the business, because the statute does not assign any significance to how a taxpayer checks that box. What is more, from 2005 to 2011, CFF responded "yes" to the same question when filing its federal-income-tax returns. Claugus testified that based on advisory opinions he received around 2012, only individuals (not farms) could check the "yes" box when responding to the material-participation question. So Claugus began answering the question "no."

{¶ 29} In support of her position that CFF is not engaged in the business of farming, the tax commissioner advances a rationale similar to that reflected in the

board's order—namely, that CFF has failed to make any sales or generate any income for several years. But she goes a step further, arguing that CFF is not engaged in farming as a business, because it did not claim any labor expenses on the Schedule F's filed with its federal-income-tax returns. The absence of labor expenses from CFF's tax filings is perhaps peculiar. But Claugus testified that CFF has spent thousands of dollars for timber-stand-improvement vendors to traverse the forest with chemicals and chainsaws to address the non-native, invasive species, and the tax commissioner does not dispute that this work occurred and that CFF paid for it.

{¶ 30} Accordingly, we conclude that CFF is engaged in farming as a business.

### B. CFF uses the Mercedes in farming

{¶ 31} Under its second proposition of law, CFF challenges the board's determination that because the Mercedes is used merely to transport people and equipment through the forest, the vehicle is not used directly in farming and thus fails the second part of the tax-exemption test. CFF asserts that the Mercedes is used for farming activities because the vehicle facilitates the carriage of people, chemicals, and equipment through the forest. CFF asserts that without the Mercedes, such tasks as removing non-native, invasive species and traversing the forest's rugged terrain to identify diseased and mature timber would be "impossible to complete." We agree with CFF that the vehicle is used in farming.

{¶ 32} As previously discussed, prior versions of R.C. 5739.02 contained a direct-use requirement by including the word "directly" in connection with the tax exemption for farming, *see* former R.C. 5739.02(B)(42)(a), Am.Sub.S.B. No. 181 (effective Sept. 13, 2010). But that word is not found in the current statutory provision that pertains to the farming exemption. *See* R.C. 5739.02(B)(42)(n). It is well established that when the General Assembly amends a statute, the change in wording conveys a change in meaning. *See Obetz v. McClain*, 2021-Ohio-1706,

¶ 21 ("The General Assembly's use of different words signals a different meaning."); Garner & Scalia, *Reading Law: The Interpretation of Legal Texts* 256 (2012) ("a change in the language of a prior statute presumably connotes a change in meaning" unless the change is "stylistic or nonsubstantive"). Thus, whereas under the former statute the property whose tax exemption was in question had to be used in "close relational proximity" to or "without any intermediate step" in producing tangible personal property for sale by farming, *Webster's Third New International Dictionary* (2002) (defining "directly"), current law no longer demands as much.

{¶ 33} In our view, the statutory amendment establishes that property may qualify as being used in farming even though it is used to perform an intermediate step in the process of producing crops (including timber) for sale by farming. Consider, for instance, a tractor pulling a plow in a cornfield. The tractor itself does not till the soil. Rather, it performs an intermediate step in the process by pulling the plow, which tills the soil.

{¶ 34} In the context of timber farming, the Mercedes that CFF uses is the functional equivalent of a tractor: just as a tractor provides the means for conveying a plow through a field where it can act upon the ground, the vehicle in this case provides the means for conveying chainsaws, marking tools, herbicides, and workers through CFF's forest, where they can act upon the forest floor to eliminate the non-native, invasive species and facilitate the growth of marketable timber.

{¶ 35} Our decision in *Saunders Mills v. Evatt*, 139 Ohio St. 227 (1942), does not cut the other way.[3] The statute at issue in that case was a predecessor to R.C. 5739.02(B)(42)(n); it provided a sales-tax exemption for "articles to be used by the consumer directly in the production of tangible personal property for sale by

_____

3. The parties do not cite *Saunders Mills* in their briefs. But we use that decision in our analysis of this case because the parties rely on later decisions of this court and the board—namely, *Tri-State Asphalt Corp. v. Glander*, 152 Ohio St. 497, 502 (1950), and *Skiles v. Tracy*, BTA No. 94-H-633, 1996 WL 765627, *2 (Oct. 18, 1996)—that analyzed the logic applied in *Saunders Mills*.

manufacturing, processing or farming." *Saunders Mills* at 227-228 (paraphrasing G.C. 5546-2). The taxpayer in that case was engaged in the manufacture and sale of alfalfa meal, a process that entailed procuring alfalfa hay from leased lands and then using its trucks to haul the hay along public roads to its dehydrating facilities. We determined that because the trucks were used solely to transport agricultural produce over public roads, the trucks were "not being used *directly* in the production of tangible personal property for sale by manufacturing, processing, or farming within the meaning of the words of exemption" contained in the statute. (Emphasis in original.) *Id.* at syllabus.

{¶ 36} This case is different. First, the statutory provision at issue here, unlike in *Saunders Mills*, does not contain a direct-use requirement. And second, the vehicle at issue here is not used solely for transportation: it is akin to a tractor that enables a plow to do its work, except here it enables CFF to apply the instruments of remediation to the forest floor to facilitate the growth of timber. In sum, CFF's Mercedes is used in farming.

*C. The Mercedes is used* primarily *in farming*

{¶ 37} Under its third proposition of law, CFF asserts that the Mercedes is used *primarily* in farming. In support of this position, it cites Claugus's testimony that 95 percent of the vehicle's use is for farming. The board, however, faulted CFF for failing to provide use or mileage logs concerning the vehicle's operation. The tax commissioner reiterates this point in her merit brief and further observes that the vehicle can traverse public roads, noting that on one occasion the vehicle got into a fender bender on the street outside a post office.

{¶ 38} CFF has the better argument. Written logs might fortify a taxpayer's position concerning the claimed use of an item of personal property, but R.C. 5739.02(B)(42)(n) does not require that use or mileage logs be kept for the tax exemption to apply. And it is not this court's function to amend the statutory provision by inserting requirements that the legislature did not prescribe. *See*

*Wheeling Steel*, 24 Ohio St.2d at 27-28. So too, the fact that an item of personal property may be used for an exempt purpose (e.g., farming) and a nonexempt purpose (e.g., driving to the post office) does not, on its own, defeat a taxpayer's claim for the use-tax exemption. That hardly controversial point is the reason the property's *primary* use is considered when determining whether the exemption applies: by distinguishing the exempt and nonexempt uses, the question whether use tax is owed on the acquisition of property may be properly determined.

{¶ 39} At bottom, the only evidence concerning the Mercedes' primary use came from Claugus, who testified that the vehicle is overwhelmingly used for farming activities. CFF has therefore shown that the vehicle is used primarily in farming.

### III. CONCLUSION

{¶ 40} The Board of Tax Appeals' decision regarding CFF's entitlement to the use-tax exemption for farming was neither reasonable nor lawful. For the reasons stated above, we conclude that CFF is engaged in the business of farming and that the vehicle CFF purchased that is at issue here is used in farming and is used primarily for that purpose. Therefore, CFF is entitled to the use-tax exemption for its purchase of that vehicle. We accordingly reverse the board's decision and remand the cause to the board for cancellation of the assessment.

Decision reversed

and cause remanded.

_____

Arnold & Clifford, L.L.P., Damion M. Clifford, and Damien C. Kitte, for appellant.

Dave Yost, Attorney General, and Chelsea Szilagyi, Raina Nahra Boulos, and Daniel Kim, Assistant Attorneys General, for appellee.

_____